**CITY OF SPOKANE, a municipal corporation, Plaintiff,**

v.

**UNITED NATIONAL INSURANCE COMPANY, a foreign corporation; Lexington Insurance Company, a foreign corporation; and Genesis Insurance Company, a foreign corporation, Defendants.**

**No. CS–01–0069–WFN.**

United States District Court, E.D. Washington.

Jan. 16, 2002.

and controversy faced by parties, it should be denied.).

Richard C. Robinson, Lee Smart Cook Martin & Patterson PS, Seattle, WA, for Plaintiff.

David Tewell, Tewell & Findlay, Grant Steven Degginger, Rehman H. Bashey, Lane Powell Spears Lubersky, Seattle, WA, Thomas Richard Luciani, Spokane, WA, Michael J. Balch, Skadden Arps Slate Meagher & Flom LLP, New York City, for Defendants.

## ORDER

NIELSEN, District Judge.

On January 14, 2002, the Court heard oral argument on the parties' pending Motions for Summary Judgment. Richard Robinson argued on behalf of Plaintiff City of Spokane, David Menz argued on behalf of Defendant United National Insurance Company, Grant Degginger argued on behalf of Defendant Lexington Insurance Company, and Michael Balch argued on behalf of Defendant Genesis Insurance Company. For the reasons discussed below, the Court denies Plaintiff's Motion and grants Defendants' Motions for Summary Judgment.

## I. BACKGROUND

On February 14, 2001, Plaintiff filed a Complaint against Defendants United National Insurance Company [United National], Lexington Insurance Company [Lexington], and Genesis Insurance Company [Genesis] in Spokane County Superior Court. On March 7, 2001, Defendant Lexington removed the case to this Court based on diversity jurisdiction. The Complaint alleges that Defendants improperly denied insurance coverage and failed to defend Plaintiff against allegations arising out of the design, construction, and operation of the Colbert Compost Facility located in Spokane County, Washington. Specifically, Plaintiff asserts that the excess insurance policies it purchased from Defendants should have covered claims arising from odors created by the compost facility; Defendants assert that their policies contained pollution exclusions precluding coverage for claims such as those relating to the odors from the compost facility.

Each party filed a Summary Judgment Motion.

## II. FACTS[1]

*Colbert Compost Facility,* In December, 1992, Plaintiff City of Spokane applied to the Spokane County Air Pollution Control Authority [SCAPCA] for approval to develop a compost facility capable of producing 70,000 tons of compost per year. The City planned construction of the facility to recycle organic solid waste into a useable composted material, thereby diverting waste from the City's Waste–to–Energy Facility. The Spokane County zoning adjuster initially denied the City's application for a conditional use permit for the compost facility, but the Zoning Board ultimately approved the City's application in April, 1993. Subsequently, on July 6, 1993, the City entered into a contract with O.M. Scott & Sons Company [Scott] and Spokane County to design, construct, and operate the compost facility.

The compost facility began accepting waste for composting in November, 1993. The facility receives incoming yard waste—including yard debris, wood waste, grass clippings, and other organic materials—and shreds those materials; the shredded waste is then spread into windrows where the material turns into compost as a result of controlled aerobic degradation. After the composting process, the material is transferred to curing areas and tested for any chemical or biological contaminants.

Certain conditions during the composting process can create anaerobic pockets that produce odors. An improper carbon-to-nitrogen ratio also can produce odors during composting. In order to lessen potential odors, the windrows at the compost facility are turned regularly and watered. The City also has implemented other various measures, including storage specifications, in an attempt to prevent odors from escaping the facility. The City anticipated the presence of "earthy" odors but intended to operate the facility in such a way to avoid any unpleasant or offensive odors.

*Agencies and Regulations Governing Compost Facility.* The contract between the City, the County, and Scott required the parties to comply with all applicable federal, state, and local laws and regulations, including requirements for permits and licenses. The Washington Solid Waste Management—Reduction and Recycling Act, Washington Revised Code § 70.95, governs the design, construction, and operation of the Colbert Compost Facility. SCAPCA's regulations, which mirror the Washington Clear Air Act, also apply to the compost facility. SCAPCA's regulations indicate that it has jurisdiction to regulate a municipal composting operation as an "air contaminant source." The SCAPCA regulations also provide the following definitions:

> *Air Contaminant* means dust, fumes, mist, smoke, other particulate matter, vapor, gas, odorous substance or any combination thereof. "Air pollutant" means the same as "air contaminant."

> *Air Pollution* means the presence in the outdoor atmosphere of one or more air contaminants in sufficient quantities and of such characteristics and duration as is, or is likely to be, injurious to human health, plant or animal life, or property;

---

1. These facts can be found in the parties' Statements of Material Facts, submitted with briefing on the pending Motions pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1. The Court deems admitted any material fact asserted by a party and not rebutted by an opposing party. The parties agree on the facts recited in this section, except where otherwise noted.

or which unreasonably interferes with enjoyment of life and property." SCAPCA Regulation I, Article I, § 1.04. Section 6.04 also requires that "[e]ffective control apparatus and measures shall be installed and operated to reduce odor-bearing gases and particulate matter emitted into the atmosphere to a reasonable minimum." Section 6.06 of the SCAPCA regulations further adds that, "[i]t shall be unlawful for any person to cause or permit the emission of an air contaminant or water vapor ... if the air contaminant or water vapor causes detriment to the health, safety, or welfare of any person or causes damage to property or business."

In addition to registering the Colbert Compost Facility with the SCAPCA as an "air contaminant source," the City also had to obtain a solid waste disposal site and facility permit from the Spokane County Health District. The Health District issues those permits annually pursuant to § 70.95 of the Revised Code of Washington and Washington Administrative Code § 173–304. The solid waste disposal permit requires that the compost facility "not cause a violation of any ambient air quality standard at the property boundary or emission standard from any emission of composting gases, combustion or any other emission associated with such a facility." The solid waste disposal permit also requires that the City maintain proper carbon-to-nitrogen ratios and moisture contents to prevent odors and promote the proper bio-degradation of the waste material processed at the facility. The disposal permit also indicates that the Health District and the SCAPCA have the authority to determine whether the compost facility violates any ambient air quality standards or other air standards.

Prior to opening the compost facility, the City also had to obtain approval of a conditional use permit from the Spokane County zoning adjuster. In its permit application, the City indicated that the compost facility would "recycle yard waste into a useable product." The City also indicated that it intended to operate the compost facility in order to meet state goals for solid waste management.

***Complaints About Compost Facility Odors.*** Even before the City received its permitting for the compost facility, local citizens expressed concern over the possibility of odors and air quality problems. In its various proposals and permits, the City indicated a commitment to comply with all laws regarding air quality and to prevent bad odors from emanating from the compost facility. Nevertheless, within two weeks of the compost facility's opening, nearby residents began reporting odors migrating from the facility. Between January 20, 1994, and January 25, 1995, SCAPCA received nearly 600 complaints from property owners near the compost facility. In the fall of 1994, nearby homeowners also began contacting the Spokane County Health District to make complaints about odors and health conditions allegedly relating to the compost facility.

Four air quality specialists from SCAPCA documented odors from the compost facility on four different dates in 1994. Shortly thereafter, employees at the compost facility considered 13 different possible techniques to control the offensive odors. SCAPCA staff later documented odors they described as rotting smells, sour ammonia smells, and sour offensive odors.

In 1995, SCAPCA issued three separate notices of violation of state odor regulations to the Colbert Compost Facility. SCAPCA officials documented that the odors had unreasonably interfered with the use and enjoyment of neighboring property. In January, 1996, the Washington State Department of Health conducted

a health study documenting numerous health complaints allegedly resulting from the compost odor and emissions. The study concluded that the odors had adversely affected nearby residents' quality of life. Despite various efforts to mitigate the odors, the compost facility continued to generate complaints.

***Homeowner Lawsuit and Settlement.*** On April 15, 1997, various persons owning homes near the compost facility filed a lawsuit against the City, the County, and Scott. The lawsuit, filed in Spokane County Superior Court, alleged that the compost facility emitted offensive, noxious, unlawful, and otherwise unreasonable odors. The homeowners asserted four causes of action arising from the emission of odors from the facility: nuisance, trespass, negligent release of odors, and taking by inverse condemnation without compensation. They alleged that the compost facility had decreased the value of their property and interfered with their use and enjoyment of the property. All claims asserted in the homeowners' complaint arose from the odors emitted by the compost facility.

In August, 1999, the City entered into a settlement with the homeowners. In that settlement agreement, the City agreed to purchase 15 homes in the area affected by the compost facility odors, at a cost of more than $3 million. Additionally, the City agreed to purchase "odor easements" for seven homes, at a cost of roughly $15,000 per easement; the easements granted the City the right to invade those properties by means of odors or physical airborne particles. The total settlement, including the homeowners' attorney's fees, totaled more than $4 million. The City also incurred substantial costs and attorney's fees in defending against the homeowners' lawsuit.

***City's Contract with Defendant United National.*** In addition to the City's $500,000 retained insurance limit, the City purchased excess insurance on an annual basis to provide coverage for personal injury or property damage caused by the City. The City contracted with United National for the policy period July 7, 1993, to July 7, 1994, under policy number XTP43096. The United National policy, like the subsequent Lexington and Genesis policies, provided that the insurance company would pay personal injury or property damages in excess of the City's $500,000 retained limit caused by an occurrence or wrongful act during the policy period.

The United National policy defines "occurrence" as "an event, act or professional act, error or omission or a continuous or repeated exposure to conditions, neither expected nor intended from the standpoint of the Insured, any of which occurred during the policy period. All damages arising out of such exposure to substantially the same general condition shall be considered as arising out of one occurrence." The United National policy defines personal injury to include "wrongful entry or eviction, or other invasion of the right of private occupancy." The policy defines property damage as "physical injury to or destruction of tangible property which occurs during the policy period, including the loss or use thereof at any time resulting therefrom, or . . . loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." The policy also contains certain exclusions, including a provision that excludes coverage for the following:

(1) The contamination of any environment by pollutants that are introduced at any time, anywhere, in anyway;

(2) All personal injury, property damage, public officials [sic] errors and omissions liability, costs or other loss or damage arising out of such con-

tamination, including but not limited to, cleaning up, remedying or detoxifying such contamination; or

(3) Payment of sums related to (a) the investigation or defense of any loss, injury or damage or (b) payment of any cost, fine or penalty or (c) payment of any expense involving a claim or suit [described] above.

The United National policy defines pollutants as "smoke, vapors, soot, fumes, acids, sound, alkalies, chemicals, liquids, solids, gases, thermal pollutants, and all other irritants or contaminants, including wastes. Wastes include materials to be recycled, reconditioned or reclaimed." The policy defines contamination as "any unclean or unsafe or damaging or injurious or unhealthful condition arising out of the presence of pollutants, whether permanent or transient in any environment."

On July 23, 1998, the City, through its third-party administrator, wrote to United National to notify the company of the homeowners' lawsuit. The letter indicated that the homeowners had demanded $1 million in settlement. United National responded by citing its policy's pollution exclusion and did not offer to defend or indemnify the City. In April, 1999, United National formally denied coverage for the homeowners' claims against the City, citing the insurance policy's pollution exclusion, inverse condemnation claim exclusion, and lack of coverage for claims for injunctive relief.

*City's Contract with Defendant Lexington.* The City contracted with Lexington for the policy period of July 7, 1994, to July 7, 1995, under policy number 8669032. The Lexington insurance policy defines occurrence as "an accident or event, including continuous or repeated exposure to conditions, which result in Personal Injury, Property Damage, or Public Errors and Omissions, neither expected nor intended from the standpoint of the Insured. All such exposure to substantially the same general conditions shall be deemed one 'Occurrence.'" The policy defines personal injury to include "[w]rongful entry into, or eviction of any person from, a room, dwelling or premises that a person occupies, or other invasion of the rights of private occupancy." The policy defines property damage as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an Occurrence during the policy period." The Lexington policy also contains the following pollution exclusion, which indicates that the policy does not apply:

(1) To any claim for Personal Injury, or Bodily Injury, or Property Damage or Public Officials [sic] Errors and Omissions arising out of the discharge, disbursal, release or escape of pollutants, anywhere in the world;

(2) To any obligation to defend any suit or claims against the Insured alleging Personal Injury, or Bodily Injury, or Property Damage, or Public Officials [sic] Errors and Omissions and seeking Damages, if such suit or claim arises from Personal Injury or Bodily Injury, or Property Damage, or Public Errors and Omissions arising out of the discharge, disbursal, release or escape of pollutants, anywhere in the world;

(3) To any loss, cost or expense arising out of any governmental direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants;

(4) To any loss, cost or expense incurred by a governmental unit or third par-

ty, including but not limited to cost of investigation and monitoring, and attorneys' fees, relating to activities in connection with efforts to test for, monitor, clean up, remove, contain, trace, detoxify or neutralize pollutants.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material, [sic] includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

The third-party administrator for the City forwarded a copy of the homeowners' complaint to Lexington approximately 15 months after the homeowners initiated their lawsuit. In January, 1999, Lexington denied coverage under the City's excess liability policy for the claims asserted in the homeowners' complaint. Lexington denied coverage based on the pollution exclusion and the inverse condemnation exclusion contained in the policy.

*City's Contract with Defendant Genesis.* The City contracted with Genesis for excess insurance for the policy period July 7, 1995, to July 7, 1996, under policy number YXB300335. The Genesis excess liability policy provides the following definition: "with respect to bodily injury and property damage, [occurrence] means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.... [W]ith respect to personal injury and advertising injury liability, occurrence means an offense or series of related offenses." The policy defines property damage as "[p]hysical injury to tangible property, including all resulting use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or ... [l]oss of use of tangible property that has not been physically injured. All such loss of use shall be deemed to have occurred at the time of the occurrence that caused it." The policy defines personal injury to include "[t]he wrongful conviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor."

The Genesis policy, like the United National and Lexington policies, also includes a pollution exclusion. That exclusion indicates that the insurance policy would not apply to any suit arising from claims or losses that "would not have occurred in whole or in part but for the actual, alleged or threatened discharge, disbursal, seepage, migration, release or escape of pollutants at any time." The pollution exclusion further provides that coverage would not be provided for the following:

Request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants; or ... claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants ... Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

On July 23, 1998, the City notified Genesis in writing of the homeowners' complaint and indicated that the homeowners had demanded $1 million in settlement. In October, 1998, a representative from Genesis telephoned the City and orally indicated that, based on the pollution exclusion, Genesis would not provide cover-

age for the homeowners' claims. The City challenged that assertion, but on December 11, 1998, Genesis formally denied coverage, citing the pollution exclusion and other provisions of the policy.

## III. STANDARD OF REVIEW

The Court should grant summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must show that no genuine issue of material fact exists and that the Court should grant judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir.1982). The Court must construe all facts and all justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

A party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978). A non-moving party may use affidavits, depositions, answers to interrogatories, and admissions to do this. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. The Court must enter summary judgment against a party who fails to make a showing sufficient to establish an essential element of a claim, even if genuine factual disputes exist regarding other elements of the claim. *Id.* at 322–23, 106 S.Ct. 2548. No issue for trial exists unless sufficient evidence favors the non-moving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Thus, a scintilla of evidence in support of the non-moving party's

position will not suffice. *Id.* at 252, 106 S.Ct. 2505.

In the instant case, although Plaintiff challenges the relevance of certain facts submitted by Defendants, the parties agree on all facts essential to the disposition of the pending Motions. The only issues in dispute center on questions of law. Summary judgment therefore should be granted, in accordance with the discussion below.

## IV. DISCUSSION

*Interpretation of Insurance Policy Exclusions.* The pending Motions present no disputed issue of material fact; the sole issue relates to the interpretation of Defendants' insurance policies. Plaintiff argues that Defendants' insurance policies contained ambiguous pollution exclusions that should be construed in Plaintiff's favor. Insurance policy interpretation presents a question of law appropriately decided on summary judgment. *Allstate Ins. Co. v. Peasley*, 131 Wash.2d 420, 932 P.2d 1244, 1246 (1997) (en banc). Washington law dictates that courts strictly construe ambiguous insurance policy exclusions in favor of the insured party. *Ross v. State Farm Mut. Auto. Ins. Co.*, 132 Wash.2d 507, 940 P.2d 252, 256 (1996); *Dairyland Ins. Co. v. Ward*, 83 Wash.2d 353, 517 P.2d 966, 969 (1974). Defendant insurance companies have the burden of proving that their policies clearly and unambiguously exclude the coverage at issue. *Teague Motor Co. v. Federated Serv. Ins. Co.*, 73 Wash.App. 479, 869 P.2d 1130, 1132 (1994). Where an exclusion is ambiguous, courts should not deny coverage. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wash.2d 50, 882 P.2d 703, 712 (1995) (en banc).

A clause is ambiguous when fairly susceptible to two different reasonable interpretations. *Am. Nat'l Fire Ins. Co. v.*

*B & L Trucking & Constr. Co.*, 134 Wash.2d 413, 951 P.2d 250, 255 (1998) (en banc). If a contract term is undefined, courts should look to the "plain, ordinary, and popular meaning" afforded in similar circumstances. *Kitsap County v. Allstate Ins. Co.*, 136 Wash.2d 567, 964 P.2d 1173, 1178 (1998) (en banc). In interpreting insurance contracts, courts should construe language as an average insurance purchaser would. *City of Bremerton v. Harbor Ins. Co.*, 92 Wash.App. 17, 963 P.2d 194, 197 (1998). Courts also should give policies a "practical and reasonable interpretation ... not a strained or forced construction that would lead to absurd results." *McMahan & Baker, Inc. v. Cont'l Cas.*, 68 Wash.App. 573, 843 P.2d 1133, 1136 (1993).

In the instant case, evaluation of whether Defendants' pollution exclusions were ambiguous or not requires close examination of the language and definitions contained in the policies. The Court also has considered the understanding an average purchaser of insurance would have regarding the policies' language in similar circumstances. Washington law also provides helpful guidance in interpreting the policy exclusions at issue.

***Odors from Compost Facility as "Pollution."***[2] The sole issue presented by the pending Motions for Summary Judgment is whether Defendants' insurance policies clearly and unambiguously exclude coverage of claims arising from the odors emitted by the Colbert Compost Facility. This presents the question of whether those odors constitute "pollutants," as defined by the policies. Defendants' insurance contracts with the City each contained a pollution exclusion, and Defendants relied on those exclusions in denying the City coverage for its claims and losses related to the homeowners' lawsuit. All Defendants argue that odors from the compost facility constitute pollution clearly excluded from insurance coverage.

Several Washington cases address facts analogous to those presented by the instant case.[3] A case recently decided by the Washington Court of Appeals addresses facts very similar to those presented by the Colbert Compost Facility. In *City of Bremerton v. Harbor Ins. Co.*, 92 Wash. App. 17, 963 P.2d 194 (1998), the court held that an insurance policy's pollution exclusion did relieve the insurance company from liability for a sewage treatment plant's "emission of foul and obnoxious

---

**2.** Defendants assert that even if the Court finds that the pollution exclusion does not apply to this case, other exclusions might apply; therefore, Defendants argue, the Court cannot find that coverage should be provided without evaluating other exclusions not briefed in instant motions. In light of the Court's ruling, it need not reach this issue.

**3.** All parties cite to various cases from other jurisdictions. *See, e.g., Kruger Commodities, Inc. v. U.S. Fid. & Guar.*, 923 F.Supp. 1474, 1479 (M.D.Ala.1996) (holding that odors from processing of used cooking oils and animal carcasses constituted pollution excluded from insurance coverage); *Hydro Sys., Inc. v. Cont'l Ins. Co.*, 717 F.Supp. 700, 702 (C.D.Cal.1989) (holding that coverage for damage caused by airborne substances emit-

ted during normal operation of industrial business excluded by pollution exclusion; citing to state regulations defining the airborne substances as pollutants); *Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 So.2d 95, 99 (Ala.1977) (holding that sand and mud flow into lakes and onto properties covered despite pollution exclusion); *Tri–Municipal Sewer Com'n v. Cont'l Ins. Co.*, 223 A.D.2d 639, 636 N.Y.S.2d 856, 857 (N.Y.App.Div.1996) (holding that odors emanating from sewage facility fit squarely within insurance policy's pollution exclusion). Although such cases may provide persuasive authority, Washington courts have directly addressed the issues presented by the instant Motions; therefore, cases from other jurisdictions provide little guidance in the Court's decision.

odors and toxic gases." Like the instant case, the odors and fumes emanating from the sewage treatment plant prompted nearby residents to file lawsuits against the city for its failure operate the plant in such a way to prevent the plant's emissions from negatively affecting their neighborhoods.

The pollution exclusion language at issue in the *Bremerton* case was nearly identical to the exclusions at issue in the instant case, except the *Bremerton* policy contained no reference to "waste" as a pollutant. *Id.* at 197. Nevertheless, the court held that a reasonable person would expect that fumes and odors from waste products would be considered pollutants excluded from coverage. The court specifically held that although the policy made no reference to odors, "the list of [possible pollutants] is illustrative and not exhaustive and odors are effectively excluded as well." *Id.* at 196.

The *Bremerton* case followed another case also addressing a policy's pollution exclusion as applied to fumes. In *Cook v. Evanson*, 83 Wash.App. 149, 920 P.2d 1223 (1996), the court held that an insurance policy's pollution exclusion precluded coverage for claims relating to fumes produced by the application of a sealant. The court referenced the sealant's product literature, which described the sealant as an "irritant and a vapor." *Id.* at 1224. Although the release of the fumes did not constitute "classic environmental pollution," the court found that the fumes emanated from the insured party's work site and were connected to the business operations. *Id.* The court therefore held that the insurance policy unambiguously excluded coverage for the harms caused by the fumes. The court noted that although the insured party purchased the insurance policy with the expectation that it would cover such claims, Washington courts "do not allow an insured's expectations to override the plain language of the contract." *Id.* at 1227.

In its Motion for Summary Judgment, the City relies primarily on a recent case decided by the Supreme Court of Washington, *Kent Farms, Inc. v. Zurich Ins. Co.*, 140 Wash.2d 396, 998 P.2d 292 (2000) (en banc). In that case, the court held that a pollution exclusion did not preclude insurance coverage in a case where a man suffered injuries after being struck by a forceful release of diesel fuel from a tank. 998 P.2d at 295. The court reasoned that the damages resulted not from environmental damage, even though diesel fuel could constitute a "pollutant" in other circumstances, but instead from tortious personal injury resulting from negligence by the insured. *Id.*

> [The man who suffered injuries] was not polluted by diesel fuel. It struck him; it engulfed him; it choked him. It did not pollute him. Most importantly, the fuel was not acting as a 'pollutant' when it struck him any more than it would have been acting as a 'pollutant' if it had been in a barrel that rolled over him, or if it had been lying quietly on the steps waiting to trip him.

*Id.* The court held that pollution exclusions in insurance policies could not preclude coverage for all occurrences involving a potential pollutant in the casual chain.

The court did not, however, address any facts analogous to the instant case. Although Plaintiff argues that the *Kent Farms* case implicitly overruled prior cases holding that odors and fumes do constitute pollutants, the supreme court in *Kent Farms* did not address any issue relating to odors and gave no indication that its holding would apply to facts such as those at issue in the instant case. Therefore, the *Bremerton* and *Cook* cases remain binding law in Washington.

■ Washington case law, particularly the *Bremerton* case, provides clear guidance in evaluating the pending Motions for Summary Judgment. Although Defendants' pollution exclusions did not explicitly list "odors" in the definitions for "pollutant" or "contaminant," the policies clearly exclude coverage for odors produced by the Colbert Compost Facility. The United National policy specifically excluded coverage for "smoke, vapors . . . fumes, acids . . . gases . . . and all other irritants and contaminants, including wastes." The policy also explicitly excludes coverage for "any unclean or . . . damaging or injurious . . . condition arising out of the presence of pollutants." The homeowners claimed that the odors, which arose from the waste processed at the compost facility, damaged their property and interfered with their use and enjoyment of that property; the City settled those claims for more than $4 million, implicitly admitting that the odors did cause damages. The Lexington pollution exclusion also lacks ambiguity, as it excludes coverage for any claims or losses "arising out of . . . pollutants." It also includes language similar to the United National policy. The Genesis policy reflects the language in the United National and Lexington policies, excluding coverage for "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants."

At oral argument, Plaintiff's counsel admitted that the compost odors enter the air as fumes or vapors. Reading the insurance policies to include coverage of odors from solid waste—although the policies clearly exclude coverage for gases, fumes, vapors, contaminants, and irritants—would require a strained interpretation and produce an absurd result. Migration of odors from a solid waste facility clearly constitutes contamination, or pollution, of the environment. The City therefore may not obtain indemnification from Defendants for its settlement with the homeowners; the policies' pollution exclusions bar coverage.

In addition to case law, state statutes and regulations also support a finding that the odors emanating from the Colbert Compost Facility constitute "pollutants" excluded from insurance coverage by Defendants' pollution exclusions. SCAPCA regulations define air contaminants as "dust, fumes, mist, smoke, other particulate matter, vapor, gas, odorous substance or any combination thereof. 'Air pollutant' means the same as 'air contaminant.'" The regulations also define air pollution as "the presence in the outdoor atmosphere of one or more air contaminants in sufficient quantities and of such characteristics and duration as is, or is likely to be, injurious to human health, plant or animal life, or property; or which unreasonably interferes with enjoyment of life and property." SCAPCA Regulation I, Article I, § 1.04(C)-(D). SCAPCA regulations also indicate that emission of an air contaminant that causes damage to property or business is unlawful, and effective control measures must be taken to reduce the emission of odor-bearing gases to a reasonable minimum. Regulation I, Article I, Sections 6.04 and 6.06.

The City registered the facility as an "air contaminant source" with SCAPCA, as required by regulation, and SCAPCA ultimately cited the City for violation of air pollution regulations based on the odors created by the compost facility. The homeowners based their claims on the City's wrongful interference with the reasonable use and enjoyment of their property. The City does not dispute that the odors constitute air pollution under applicable environmental laws. The City argues, however, that SCAPCA definitions should not govern but plain and ordinary meanings should guide the Court instead.

Although the insurance policies at issue in this case did not incorporate the definitions provided by SCAPCA regulations and other applicable laws and permitting requirements, those sources do provide insight into what an ordinary purchaser of a municipal insurance policy would expect a pollution exclusion to exclude from coverage. Long before the City purchased the insurance policies from United National, Lexington, and Genesis, the City had classified the Colbert Compost Facility as a solid waste processing and recycling facility, and had registered the facility with government agencies as an "air contaminant source." Therefore, an average purchaser of these insurance policies would have understood that their exclusions of coverage for liability arising from air contaminants would apply to the compost facility's emission of such contaminants.

Defendants further claim that even if the Court determines that the odors did not themselves constitute "pollution," the policies' pollution exclusions still bar any coverage because the odors "arose from" a contaminant specifically listed in the policies: waste. Washington courts have held that the phrase "arising out of" means "originating from," "growing out of," "flowing from," or "having its origin in." *Beckman v. Connolly*, 79 Wash.App. 265, 898 P.2d 357, 361 (1995).

The city admits that it constructed the facility to recycle waste, pursuant to state waste management laws. The City had to obtain a solid waste disposal site and facility permit from the Spokane County Health District to operate the facility. The City also had to obtain a conditional use permit from the Spokane County zoning adjustor; in its application for that permit, the City described the facility as one to recycle waste, pursuant to the Spokane County Solid Waste Management Plan. The city also admits that the homeowners' claims related solely to the odors

emitted by the composting waste at the facility.

Defendants further argue that the odors from the Colbert Compost Facility meet the policies' definitions for "irritants." Because the insurance policies do not specifically define irritants, the parties cite to dictionary definitions for "irritant" as something that "cause[s] (an organ or tissue) to be irritable." Defendants assert that because the homeowners complained of health problems and physical irritations allegedly resulting from compost odors, the odors meet the ordinary definition of an irritant. The City, however, argues that its settlement with the homeowners was based only on claims regarding land, not claims regarding health problems.

Defendant United National also makes the alternative argument that the odors from the Colbert Compost Facility meet the definition for "pollutant" because they constituted gases and acids—pollutants specifically listed in the insurance policies' pollution exclusions. United National indicates that portions of the record refer to the odor problem as one involving "compost gases," the "off-gas" from the compost windrows, "gaseous ammonia," and "odor-bearing gases." United National also points to portions of the record that refer to the compost odors as involving "volatile organic acids," including "benzoic, acetic, butyric, formic, lactic, and propionic acids. All of these carry odors . . ." Defendants make several compelling arguments supporting a finding that the odors from the Colbert Compost Facility do constitute "pollutants." However, based on the preceding analysis finding that the odors constituted contaminants as defined by the policies, the Court need not reach the parties' arguments regarding whether the odors met the definition of an irritant, gas, or acid, or determine whether the odors "arose from" pollutants.

## V.   CONCLUSION

The Court finds that the pollution exclusions in Defendants' insurance policies clearly and unambiguously exclude coverage for losses relating to odors emanating from the Colbert Compost Facility. Washington case law, statutes, and air pollution regulations support this conclusion. Therefore, Defendants bear no liability for claims or damages resulting from such odors. Accordingly,

**IT IS ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, **Ct. Rec. 41**, is **DENIED**.

2. Defendant United National's Motion for Summary Judgment, **Ct. Rec. 26**, is **GRANTED**.

3. Defendant Lexington's Motion to File Overlength Brief on Summary Judgment, **Ct. Rec. 30**, is **GRANTED**. The Court considered the brief as filed.

4. Defendant Lexington's Motion for Summary Judgment, **Ct. Rec. 34**, is **GRANTED**.

5. Defendant Genesis' Motion for Summary Judgment, **Ct. Rec. 23**, is **GRANTED**.

The District Court Executive is directed to:

(a) File this Order;

(b) **ENTER JUDGMENT FOR DEFENDANTS** consistent with this Order;

(c) Provide copies of this Order and the Judgment to counsel; and

(d) **CLOSE THIS FILE**.