MARÍA ISABEL MOLINA TEXIDOR y OTROS, demandantes, *v.* CENTRO RECREATIVO PLAZA ACUÁTICA, demandado y demandante contra coparte apelante, y UNIVERSAL INSURANCE Co., demandada y demandada contra coparte apelada.

*Número:* AC-2001-24        *Resuelto:* 21 de noviembre de 2005

*Ricardo R. Pavía Cabanillas* y *José E. Colón Rodríguez*, abogados de la parte apelante; *José E. Hernández Rodríguez, Carmen C. Ríos Oppenheimer, Héctor R. Díaz Olmo, José A. Rodríguez Jiménez, Gloria Cardona Aldarondo, Anabelle Vázquez Rodríguez, Eduardo J. Castillo Blanco, Eduardo Carrión, Héctor L. Moreno Lunda, Gladis Reyes Muñoz, Teresa Aponte Morales, Luis E. Hernández Cuevas, Luis E. Rodríguez Santiago, Ángel M. Rivera Munich* y *Erasmo A. Reyes Pena*, abogados de la parte apelada.

La Juez Asociada Señora Rodríguez Rodríguez emitió la opinión del Tribunal.

Este caso nos brinda la oportunidad de expresarnos sobre el alcance y la validez de una cláusula de exclusión total de responsabilidad por contaminación (*total pollution exclusion clause*) contenida en una póliza de seguros. Este tipo de cláusula es común en los seguros comerciales de responsabilidad pública (*commercial comprehensive general liability insurance*) y pretende excluir la cobertura por daños causados como resultado de eventos de contaminación ambiental.

I

Los hechos que sirven de trasfondo a la controversia que está ante nuestra consideración son sencillos y no están en controversia.

El 17 de mayo de 1997 ocurrió un incidente en una de las piscinas del Centro Recreacional Plaza Acuática (Plaza Acuática) que produjo la intoxicación a varias personas que utilizaban una de las piscinas del centro recreacional. Como resultado del incidente, se instaron doce demandas por daños y perjuicios en distintas salas del Tribunal de Primera Instancia; estos casos fueron consolidados. Se alegó en las demandas que ese día ocurrió un escape de ácido clorhídrico e hipoclorito de sodio en el área de la pis-

cina que produjo la intoxicación mencionada.(¹) Estas sustancias son dos productos químicos que se utilizan comúnmente para purificar el agua de las piscinas comerciales y residenciales. Las demandas se instaron contra Plaza Acuática y su aseguradora, Universal Insurance Company (Universal). Plaza Acuática instó una demanda de coparte contra Universal.

Universal se negó a ofrecerle representación legal y cobertura a Plaza Acuática en diez de los casos, bajo el fundamento de que la cláusula de exclusión total de responsabilidad por contaminación del seguro comercial excluía los daños provocados por contaminantes, tales como el ácido clorhídrico y el hipoclorito de sodio.(²) La cláusula en controversia, en lo pertinente, expone lo siguiente:

> The insurance does not apply to:
> "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.
> ....
> *Pollutants* means any solid, liquid, gaseous, or thermal *irritant* or *contaminant[t]* including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled reconditioned or reclaimed. (Énfasis en el original.) Apelación, pág. 3.

Así las cosas, Plaza Acuática solicitó que se dictara sentencia sumaria parcial a su favor y se le ordenara a Universal que le proveyese representación legal en todos los casos. Adujo en su moción que la cláusula en controversia era ambigua y que, como tal, debía interpretarse contra el asegurador y a favor de reconocer la cobertura. Indicó que la interpretación literal propuesta por Universal sobre la

---

(¹) Sobre este hecho no hay controversia. Fue alegado en cada una de las demandas instadas y fue reconocido en sus contestaciones y en las mociones de sentencia sumaria presentada por las demandadas.

(²) No surge del expediente ante nuestra consideración ni nos ha sido explicado el porqué se concedió la representación legal en dos de las demandas y se negó en las otras.

cláusula de exclusión llevaba a resultados absurdos, lo que abonaba a su conclusión de que la cláusula era ambigua. Además, adujo que las sustancias que causaron el incidente no eran contaminantes y que por su naturaleza común y uso generalizado no supuso que Universal los pudiera considerar como tales.

Universal, por su parte, se opuso a la solicitud de Plaza Acuática y, a su vez, presentó una moción de sentencia sumaria. En ésta indicó que la responsabilidad de una aseguradora de ofrecer cobertura al asegurado y defenderlo en la causa instada en su contra, se determina a base de las alegaciones de la demanda y cómo enmarca lo alegado dentro de los términos y las condiciones de la póliza suscrita. A base de lo anterior, Universal arguyó que la cláusula de exclusión total de responsabilidad incluida como endoso a póliza de Plaza Acuática no proveía una cubierta para los daños alegados en la demanda. Ello así, ya que éstos fueron el resultado de un escape de ácido clorhídrico e hipoclorito de sodio, sustancias que "son contaminantes conforme a la cláusula, pues son irritantes cuando vienen al (sic) contacto con los seres humanos". Alegato de la recurrida, págs. 14–15. En apoyo a su solicitud se anejaron a la moción de sentencia sumaria una copia del endoso de exclusión de la póliza y de un informe de la Junta de Calidad Ambiental sobre el incidente acaecido.

El 9 de mayo de 2000, el Tribunal de Primera Instancia dictó su sentencia. El foro primario determinó que la controversia sobre la cláusula de exclusión total era una controversia de derecho, por lo que era apropiado resolverla sumariamente. Así, el tribunal concluyó que la cláusula de exclusión de responsabilidad por contaminación era válida y no ambigua, y que los químicos que produjeron los daños que se alegaron eran irritantes o contaminantes, por lo que la compañía de seguros no estaba obligada a ofrecer representación legal ni cobertura por disposición expresa de la

póliza. La demanda contra Universal fue entonces desestimada.

Inconforme, Plaza Acuática acudió ante el entonces Tribunal de Circuito de Apelaciones. El foro apelativo intermedio confirmó al foro primario bajo los mismos fundamentos que adujo el Tribunal de Primera Instancia.

Nuevamente inconforme, Plaza Acuática acudió ante nosotros con un recurso de apelación. En su petición señaló como único error el siguiente:

> Incidió el Tribunal apelativo al entender que la definición de "pollutant" contenida en la cláusula de exclusión de responsabilidad basada en contaminación es clara y libre de toda ambigüedad.

El 8 de junio de 2001 acogimos el recurso instado como una petición de *certiorari* y lo expedimos. Tanto Plaza Acuática como Universal presentaron sus respectivos alegatos, por lo que estamos en posición de resolver y pasamos a así hacerlo.

## II

En sus alegatos ante nosotros, las partes han esgrimido, sustancialmente, los mismos fundamentos que los discutidos ante los foros inferiores. Plaza Acuática, además, nos advierte que, contrario a lo aseverado por el tribunal apelativo, no existe uniformidad en los tribunales tanto federales como estatales de Estados Unidos respecto al alcance de este tipo de cláusula de exclusión. Por el contrario, indicó que la jurisprudencia más reciente se inclina a avalar la posición por ella esgrimida. Enfatizó que estas cláusulas surgieron en respuesta a la legislación ambiental promulgada por el Congreso de Estados Unidos, por lo que cualquier interpretación sobre esta cláusula tiene que hacerse en función de su historial.

Por su parte, Universal recreó ante nosotros los argumentos esgrimidos ante los foros inferiores. En apoyo a su posición nos indicó que la cláusula ha evolucionado a través de los años hasta convertirse en una cláusula de exclusión total de responsabilidad cuando se trata de sustancias o productos químicos que sean irritantes o contaminantes como los aquí involucrados, con independencia de que el evento se relacione o no con una situación de contaminación ambiental. Al igual que el Tribunal de Apelaciones, aseveró que su posición era la que mayor apoyo goza en la jurisprudencia federal y estatal de Estados Unidos.

Enmarcada la controversia en estos términos, pasemos a analizarla.

■ A. El negocio de seguros está revestido de un alto interés público, por lo cual ha sido regulado ampliamente por el Estado. Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957 (26 L.P.R.A. sec. 101 *et seq.*); *Comisionado de Seguros v. Anglo Porto Rican*, 97 D.P.R. 637, 640 (1969). Las pólizas de seguro que generalmente se mercadean en Puerto Rico son pólizas modelos semejantes o idénticas a las vendidas en Estados Unidos. En virtud de ello, hemos reconocido que la jurisprudencia federal y estatal interpretativa de estas pólizas es de "obvia utilidad y gran valor persuasivo en nuestra jurisdicción". *Meléndez Piñero v. Levitt & Sons of P.R.*, 129 D.P.R. 521 (1991).

■ El Código de Seguros establece la norma de hermenéutica aplicable a la interpretación de las pólizas de seguros, al disponer que "todo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". Art. 11.250 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1125. Véase *Díaz Ayala et al. v. E.L.A.*, 153 D.P.R. 675 (2001). En esta tarea, las normas

generales del Código Civil sobre interpretación de contratos aplicarán sólo de manera supletoria. *Banco de la Vivienda v. Pagán Ins. Underwriters*, 111 D.P.R. 1, 16 (1981); Arts. 1233–1241 del Código Civil, 31 L.P.R.A. secs. 3471–3479.

En *Banco de la Vivienda v. Pagán Ins. Underwriters*, ante, específicamente indicamos que por ser el contrato de seguros un contrato de adhesión, está sujeto "más que cualquier otro contrato bilateral, a la influencia y modificación que sobre el texto produce la intención y el propósito de las partes al vender el asegurador y comprar el asegurado la cubierta específica contra el riesgo particular que es causa del contrato". *Banco de la Vivienda v. Pagán Ins. Underwriters*, ante, pág. 6. En atención a lo cual hemos reconocido que los términos de las pólizas de seguro "deben ser generalmente entendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces". *Morales Garay v. Roldán Coss*, 110 D.P.R. 701, 706 (1981). Así, el asegurado que adquiere una póliza tiene derecho a confiar en la cubierta que se le ofrece "leyendo las cláusulas del contrato a la luz del sentido popular de sus palabras". *Morales Garay v. Roldán Coss*, ante, pág. 706. Véanse, además: *Barreras v. Tribunal*, 87 D.P.R. 227, 231–233 (1963); *Rosario v. Atlantic Southern Ins. Co. of P.R.*, 95 D.P.R. 765 (1968); *Pagán Caballero v. Silva Ortiz*, 122 D.P.R. 105, 110–111 (1988).

El propósito de todo contrato de seguros es la indemnización y protección en caso de producirse el suceso incierto previsto. Art. 11.250 del Código de Seguros de Puerto Rico, ante. En vista de ello, hemos indicado que las cláusulas de exclusión de responsabilidad deben interpretarse restrictivamente y resolver las dudas de modo que se cumpla con el propósito de la póliza. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 D.P.R. 881, 902 (1994). Ahora bien, "si una cláusula de exclusión aplica claramente a determi-

nada situación", la aseguradora no está obligada a responder por los riesgos expresamente excluidos. *Marín v. Amerian Int'l Ins. Co. of P.R.*, 137 D.P.R. 356, 362 (1994). Después de todo, una póliza es en última instancia un contrato y, como todo otro contrato, constituye la ley entre las partes. Así, cuando los términos de la póliza son claros, específicos y libre de ambigüedades, las partes tienen que atenerse a lo allí dispuesto. *López v. Atlantic Southern Ins. Co.*, 158 D.P.R. 562 (2003); *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996); *Meléndez Piñero v. Levitt & Sons of P.R.*, 129 D.P.R. 521 (1991); *González v. Coop. Seguros de Vida de P.R.*, 117 D.P.R. 645 (1986). No se admitirá una interpretación que vulnere el claro propósito y voluntad de las partes. *Domínguez v. GA Life*, 157 D.P.R. 690 (2002).

Con este trasfondo doctrinal en mente, pasemos a evaluar el contrato de seguro ante nuestra consideración, no sin antes hacer un recuento histórico de la cláusula impugnada, ya que ello nos permitirá auscultar su verdadero propósito. Veamos.

B. En el pasado no habíamos tenido ocasión de expresarnos sobre la cláusula de exclusión que hoy nos ocupa. En Estados Unidos, sin embargo, ésta ha sido objeto de amplia litigación, por lo que existe variada jurisprudencia tanto federal como estatal sobre su alcance. La extensa discusión doctrinal y jurisprudencial que ha generado esta cláusula ha sido descrita como un cenagal (*quagmire*) de interpretaciones judiciales incompatibles en torno al ámbito y alcance de la exclusión. S. Marrs, *Pollution Exclusion Clauses: Validity and Applicability*, 26 Tort & Ins. L.J. 662, 667 (1991); C.G. Catalano, *Construction and Application of Absolute or Total Pollution Exclusion Clause in Liability Insurance Policy*, 106 A.L.R.5th 1 (2003).(3) Véase

---

(3) En igual sentido, véanse: R.S. Burke, *Pollution Exclusion Clauses: The Agony, The Ecstasy, and the Irony for Insurance Companies*, 17 N. Ky. L. Rev. 443 (1990); N. Ballard y P.M. Manus, *Clearing Muddy Waters: Anatomy of the Compre-*

*Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 950 (D.C. Cir. 2001) ("Courts around the country are divided in construing the scope of the pollution exclusion clause. Some courts read the clause expansively and thereby give broad reach to the exclusion, and others find the clause ambiguous and construe it narrowly in favor of insured parties seeking coverage").

Las cláusulas de exclusión de responsabilidad por contaminación comenzaron a utilizarse con mayor frecuencia en las pólizas comerciales de responsabilidad pública (*general liability policy*) en la década de los años setenta, en respuesta a una preocupación de la industria de seguros sobre el alto costo de las reclamaciones ambientales. Ello así, principalmente, en virtud de la aprobación por el Congreso de Estados Unidos en 1976 del *Resources Conservation and Recovery Act of 1976* (RCRA), 42 U.S.C.A. sec. 6901 *et seq.*, y poco después, en 1980, del *Comprehensive Enviromental Respose, Compensation and Liability Act of 1980* (CERCLA), 42 U.S.C.A. sec. 9601 *et seq.* Véase *Essex Ins. Co. v. Tri-Town Corp.*, 863 F.Supp. 38 (D. Mass. 1994) ("the insurance industry reacted with lighting speed to the possibility that ... it could find itself indemnifying industries facing the staggering retroactive clean-up costs imposed by the 1980 enactment of the Comprehensive Environmental response Compensation and Liability Act").[4]

A esos efectos se promovió un lenguaje en las pólizas que sólo proveía cubierta cuando el daño ambiental por el que se reclamaba era un daño de carácter "repentino y ac-

---

*hensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610 (1990); C.G. Catalano, *What constitutes "pollutant", "contaminant", "irritant", or "waste" within meaning of absolute or total pollution exclusion liability insurance policy*, 98 A.L.R.5th 193 (2002).

[4] El profesor Jerry nos señala correctamente lo siguiente respecto a la relación entre la legislación ambiental promovida por el Congreso y la industria del seguro. Indica: "The insurance coverage issues in environmental liability situations cannot be understood without a basic grasp of the regulatory environment for hazardous waste." R. Jerry, *Understanding Insurance Law*, 3ra ed., Lexis Nexis, 2002, Sec. 65[5][i], pág. 557.

cidental" (*sudden and accidental*). Estas cláusulas se denominaron como cláusulas de exclusión de responsabilidad condicionada. Como era de esperarse, éstas generaron múltiples litigios sobre el significado de "repentino y accidental", con resultados inconsecuentes y no satisfactorios para la industria. 9 *Couch on Insurance3d* Sec. 127:3 (2005); S.M. Murphy, *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Enviromental Liability*, 45 Vand. L. Rev. 161, 163–172 (1992).

En 1986 la industria del seguro, a través de la organización conocida como Insurance Services Office, que agrupa a numerosas compañías de seguro, promulgó y propulsó la adopción de un nuevo endoso de exclusión. Éste pretendía proveer un lenguaje de mayor claridad y, por lo tanto, certeza que facilitara la interpretación de la cláusula. Ballard y Manus, *op. cit.*, pág. 621 esc. 41. De esta forma surgieron las llamadas "cláusulas de exclusión total o absoluta de responsabilidad por contaminación" (*total or absolute pollution exclusion clauses*). El lenguaje de exclusión, utilizado en la póliza que nos ocupa, es virtualmente idéntico al promovido en 1986 por el Insurance Services Office.

No empece lo anterior, y como ya indicamos, la jurisprudencia federal y estatal estadounidense denota una gran falta de uniformidad sobre cómo interpretar estas cláusulas. Innumerables tribunales han determinado que el lenguaje que nos ocupa es claro y libre de ambigüedades, por lo que no provee cubierta para situaciones similares a la alegada en este caso;(5) aún así existe amplia jurispru-

---

(5) Véanse, entre otros: *Wenstern World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 122 (2do Cir. 1990); *Hydro Systems, Inc. v. Continental Ins. Co.*, 929 F.2d 427 (9no Cir. 1991); *City of Spokane v. United Nat. Ins. Co.*, 190 F.Supp.2d 1209, 1221 (E.D. Wash. 2002); *Toledo v. Van Waters & Rogers, Inc.*, 92 F.Supp.2d 44, 52 (D. R.I. 2000); *Longaberger Co. v. U.S. Fidelity & Guar. Co.*, 31 F.Supp.2d 595 (S.D. 1998); *Pa. Nat. Mut. Cas. Ins. Co. v. Triangle Paving, Inc.*, 973 F.Supp. 560, 567 (E.D. N.C. 1996);

dencia que sostiene todo lo contrario.(⁶) Como vemos, entonces la posición de cada una de las partes en este caso encuentra apoyo en la jurisprudencia norteamericana, ante la divergencia en opiniones y la ausencia de un claro consenso sobre cómo interpretar este tipo de disposición.

El argumento principal esgrimido en la doctrina para concluir que la cláusula de exclusión no es ambigua es su propio lenguaje, el cual de su faz expresa qué riesgo no está cobijado por la póliza. La cláusula de exclusión ante nuestra consideración, en lo pertinente, dispone que la póliza no será extensiva a daños físicos o a la propiedad, que no hubieran ocurrido en todo o en parte, como resultado, alegada o potencialmente, de un derrame, escape o descarga de contaminantes (*pollutants*). Los contaminantes, a su vez, quedan definidos como sólidos, líquidos, gases, irritantes o contaminantes térmicos que incluyan humo, vapor, hollín, gases, ácidos, químicos y desperdicios. Este lenguaje, por lo tanto: (1) identifica el tipo de material o agente que produce la contaminación (*i.e.*, humo, vapor, hollín, un irritante o contaminante); (2) describe la naturaleza o propiedad de ese agente contaminante (*i.e.*, sóli-

---

Alcolac Inc. v. California Union Ins. Co., 716 F.Supp. 1546, 1549 (D. Cal. 1989); *Matcon Diamond, Inc. v. Penn Nat. Ins. Co.*, 815 A.2d 1109, 1115 (2003); *Tartan Oil Corp. v. Clark*, 258 A.D.2d 457, 458 (N.Y. 1999); *Peace v. Northwerstern Nat. Ins.*, 596 N.W.2d 429 (1999); *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777 (1999); *Deni Associates v. State Farm Ins.*, 711 So. 2d 1135 (1998); *Bernhardt v. Hartforod Fire Ins.*, 648 A.2d 1047 (1994). Los tratadistas Russ y Segalla sostienen igual criterio, al señalar: "The majority of courts have held that total pollution exclusion 'is clear and unambiguous'." 9 *Couch on Insurance3d* Sec. 127:3, pág. 127-43 (2005).

(⁶) Véanse, entre otros: *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30 (1er Cir. 1999); *Auto-Owners Ins. Co. v. Potter*, 105 Fed. Appx. 484 (4to Cir. 2004); *Stoney Run Co. v. Prudential-LMI Commercial Ins. Co.*, 47 F.3d 34, 36-37 (2do Cir. 1995); *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1183 (6to Cir. 1999); *Pipefitters Welfare Educ. Fund v. Westchester Fire*, 976 F.2d 1037, 1043 (7mo Cir. 1992); *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.*, 768 F.Supp. 1463, 1470 (D. Kan. 1991); *Nav-Its, Inc. v. Selective Ins. Co.*, 869 A.2d 929, 930 (2005); *Allstate Ins. Co. v. Barron*, 848 A.2d 1165, 1181 esc. 19 (2004); *Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 18 (2003); *Andersen v. Highland House Co.*, 757 N.E.2d 329 (2001); *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948 (1996); *Kenyon v. Sec. Ins. Co. of Hartford*, 626 N.Y.S.2d 347, 350 (N.Y. Sup. Ct. 1993), aff'd, 206 A.D.2d 980 (1994); *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 620 (1995); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 681 (Ky. 1991).

dos, líquidos, gases); (3) especifica la forma en que se disemina el contaminante (*i.e.*, derrames, escapes o descargas).

El lenguaje de la cláusula especifica el riesgo o siniestro no cobijado por la póliza. A base de lo anterior, se concluye que la exclusión es clara y de carácter absoluta. Este es precisamente el argumento que presenta Universal en este caso en apoyo a su posición, al indicar que aquí hubo un evento contaminante, ya que hubo un escape de unos químicos —ácido clorhídrico e hipoclorito de sodio— que al contacto con seres humanos se convierten en irritantes. Nos urge que adoptemos su interpretación.

Por las razones que pasamos a discutir, declinamos la invitación.

## III

No hay duda que una lectura literal de los términos de la cláusula de exclusión de responsabilidad que nos ocupa parece apuntar, tal y como nos indica Universal, a que la cláusula es clara y específica en cuanto al riesgo no cubierto. Ahora bien, cualquier interpretación del contrato de seguros tiene que atenerse a la normativa previamente mencionada y aquella que postula que cuando un contrato de seguros es susceptible de dos interpretaciones, se favorecerá la que sea en beneficio del asegurado. *Barreras v. Santana*, ante, pág. 231. Veamos.

De entrada, llama la atención que un texto que se reputa libre de ambigüedades haya generado tan extensa litigación con resultados tan disímiles. No parece razonable entonces concluir sin más, y sólo atendiendo al rigor gramatical de la cláusula de exclusión, que ésta es clara y precisa. Después de todo, la ambigüedad puede surgir de la faz de la póliza o en su aplicación a una reclamación en particular. *Motorists Ins. Co. v. RSJ, Inc.*, 926 S.E.2d 679, 680 (1996) ("An ambiguity may either appear on the face of a policy or, in this case, when a provision is applied to a

particular claim"). El estado babélico de la normativa jurisprudencial en esta área es un factor a considerar al determinar si la cláusula en cuestión es o no ambigua. *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 624 (1995) ("conflicting interpretations of policy language in judicial opinions is not determinative of, but is a factor to be considered in determining the existence of ambiguity").

Por otro lado, una interpretación literal de esta cláusula de exclusión llevaría, necesariamente, a unos resultados absurdos e indeseados. Ya en el pasado hemos expresados que una interpretación de una ley o un contrato que lleve a resultados absurdos no puede sostenerse. *S.L.G. Irizarry v. S.L.G. García*, 155 D.P.R. 713 (2001); *Celis Alquier v. Méndez*, 18 D.P.R. 88 (1912); *Serra, Garabaris & Co., Inc. v. Municipio*, 42 D.P.R. 468 (1931); *Oxios v. Registrador*, 39 D.P.R. 447 (1929). Nos explicamos.

El fundamento principal de Universal es que ya que el escape o derrame en este caso fue de unos químicos que son "irritantes" y "contaminantes" al contacto con personas, la cláusula de exclusión de responsabilidad por contaminación se activa automáticamente y la aseguradora no está obligada a ofrecer cubierta ni representación legal. De avalarse esta interpretación, la dimensión de la exclusión produciría resultados no sólo insospechados, sino irrazonables. A modo de ejemplo, bajo la interpretación propuesta, el daño causado a una persona que resbala y cae al piso, luego de derramarse el contenido de un envase del detergente clorox, no sería un riesgo cubierto por la póliza de seguro en virtud de la cláusula de exclusión de responsabilidad por contaminación. Lo cierto es que, aun cuando el clorox es un irritante o contaminante que bajo ciertas condiciones puede causar daños físicos y a la propiedad, de ordinario, este incidente no se cataloga o considera como una contaminación. No hay duda de que se requiere algo más. Por ello es que entendemos acertadas las siguientes expresiones del Tribunal de Apelaciones de Es-

tados Unidos para el Sexto Circuito en *Pipefitters Welfare Educational Fund v. Westchester Fire*, 976 F.2d 1037, 1043 (6to Cir. 1993): "Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results."

■ Nos resulta preocupante avalar una interpretación tan amplia de la póliza que excluya de su cubierta casos que nada tienen que ver con eventos de contaminación ambiental, tal y como este concepto se entiende comúnmente. Máxime, cuando sabemos que la cláusula en cuestión adviene al mundo de la industria del seguro precisamente en respuesta a la explosión en la litigación de desastres ambientales. Su ámbito de aplicación, por lo tanto, debe limitarse a situaciones de esta naturaleza. Nos parece que una persona razonable confrontada con la cláusula de marras la interpretaría como aplicable sólo a situaciones de contaminación ambiental.

La propia cláusula abona a esta interpretación. Así, vemos cómo el lenguaje que utiliza —derrame, descarga, escape— son términos típicos (*terms of art*) provenientes del derecho ambiental, donde se utilizan para referirse a daños causados por actos de contaminación ambiental. *Nautilus Insurance Co. v. Jabar*, 188 F.3d 27, 30 (1er Cir. 1999) ("the terms used in the exclusion clause, such as 'discharge,' 'dispersal,' and 'escape,' are terms of art in environmental law and are generally used to refer to damage or injury resulting from environmental pollution"). En igual sentido, véanse: *Atlantic Mut. Ins. Co. v. McFadden*, 595 N.E.2d 762, 764 (1992); *West American Ins. Co. v. Tufco Flooring East, Inc.*, 409 S.E. 692, 699 (1991).

■ Coincidimos, por lo tanto, con aquellos tribunales que han limitado la aplicación de la cláusula de exclusión de responsabilidad por contaminación a aquellos riesgos tradicionalmente asociados con la contaminación ambiental. *Nautilus Insurance Co. v. Jabar*, ante, pág. 31; *Stoney Run Co. v. Prudencial-LMI Comercial Ins. Co.*, 47

F.3d 34, 38 (2do Cir. 1995); *Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 498 (10mo Cir. 1994) ("It seems far more reasonable that a policyholder would understand the exclusion as being limited to irritants and contaminants commonly thought of as [environmental] pollutants and not as applying to every possible irritant or contaminant imaginable"); *American Ins. Co. v. Koloms*, ante, pág. 82 ("We hold that the exclusion applies only to those injuries caused by traditional environmental pollution"); *West American v. Tufco*, ante, pág. 699 ("The historical purpose of the pollution exclusion limits the scope of the exclusion to environmental damage").

En este caso los químicos involucrados en el incidente son productos utilizados comúnmente en la purificación del agua en las piscinas, incluyendo las piscinas residenciales. Son, por lo tanto, utilizados a diario en el negocio que operaba Plaza Acuática. Ésta, por ello, no podía suponer que la póliza que adquiría de Universal iba a excluir de su cubierta situaciones de alegados daños resultantes de la utilización rutinaria de uno de los productos en la operación de su negocio, que por algún motivo malfuncionó en esta ocasión. *Piperfitters Welfare Education Fund v. Westchester Fire*, ante, pág. 1044 (la cláusula de exclusión no aplica cuando el daño es el resultado de "everyday activities gone slightly, but not surprisingly, awry"). De lo contrario, debemos plantearnos, ¿cuán útil era entonces la póliza que adquiría?

Conforme se alegó en la demanda instada en este caso, la intoxicación de los demandantes ocurrió cuando en la "piscina de marullos" comenzaron a salir "burbujas grandes en el agua ... que explotaban y salían de ellas 'algo' que los dejaba sin respirar y los mareaba y que salía además un vapor de agua ...". Se alegó, además, que ello ocurrió como resultado de la presencia de ácido clorhídrico e hipoclorito de sodio en la piscina producto de, entre otras cosas,

el "mal funcionamiento del equipo" utilizado. Según la demanda, la fuga se circunscribió a la piscina de marullos del centro y su alrededor. Apéndice a la Petición de *certiorari*, págs. 428–429.

■     Resolvemos que, ya que la cláusula de exclusión total de responsabilidad por contaminación es susceptible de dos posibles interpretaciones y que hemos resuelto que en esos casos se debe favorecer la interpretación que permita ofrecer cubierta al asegurador, a tenor con su historial procede determinar que las cláusulas de exclusión total de responsabilidad por contaminación aplican sólo a eventos de contaminación ambiental, según este concepto se entiende comúnmente. Resolvemos, además, que en vista de que el evento por el cual se reclamó en este caso se circunscribió a la "piscina de marullos" y su área circundante, y que el agente involucrado en el incidente es el utilizado rutinariamente en el negocio del recurrente, la cláusula de exclusión total de responsabilidad por contaminación no aplica a los hechos de este caso.

Surgiendo lo anterior de la faz de la demanda instada en este caso, Universal no podía negarse a brindarle representación legal a su asegurado. *Fernández v. Royal Indemnity Co.*, ante, pág. 863 ("si [las] alegaciones [de la demanda] establecen hechos que colocan [o podrían colocar] el daño dentro de [la cobertura] de la póliza, el asegurador tiene que defender [a su cliente] independientemente de la responsabilidad que en última instancia tenga el asegurado para con el demandante"). En igual sentido, véase *PFZ Properties, Inc. Ge. Acc. Ins. Co.*, ante, págs. 893–902.

*Se revoca, por lo tanto, la determinación del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos en conformidad con lo aquí resuelto.*

*Se dictara sentencia de conformidad.*

La Jueza Asociada Señora Fiol Matta no intervino. La Juez Asociada Señora Rodríguez Rodríguez disintió sin opinión escrita.