Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| LIME PROPERTIES, LTD.<br><br>Demandante-Recurrida<br><br>V.<br><br>MAPFRE PRAICO INSURANCE COMPANY; COOPERATIVA DE SEGUROS MÚLTIPLES DE PUERTO RICO; CONSEJO DE TITULARES DEL CONDOMINIO ASHFORD VALENCIA; CRM MANAGEMENT, INC, L SUCN. CASTILLO PAVIA; SUCN. DELGADO RUIZ<br><br>Demandados-Peticionarios | KLCE202301152 | Recurso de *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2019CV00997<br><br>Sobre: Consecuencias del Conocimiento de un Asegurado sobre un Daño previo a la expedición de una Póliza de Seguro |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Adames Soto, la Jueza Mateu Meléndez y el Juez Marrero Guerrero

Marrero Guerrero, Juez Ponente

## RESOLUCIÓN

En San Juan, Puerto Rico, a 27 de noviembre de 2023.

Comparece MAPFRE PRAICO Insurance Company (MAPFRE o parte peticionaria) mediante recurso de *Certiorari* y solicita que revisemos una Sentencia Sumaria Parcial emitida por el Tribunal de Primera Instancia, Sala de San Juan (TPI). Particularmente, nos solicita que tomemos conocimiento de ciertos hechos y que desestimemos con perjuicio una Tercera Demanda Enmendada presentada por Lime Properties LTD (Lime Properties o parte recurrida) en contra de la parte peticionaria. En apretada síntesis, el TPI entendió que, a pesar de la evidencia presentada por la parte peticionaria para sustentar su contención, existían controversias de hechos importantes que impedían desestimar la demanda por la vía sumaria. Luego de analizar el expediente del caso, estamos de

acuerdo con la determinación del TPI. Por lo tanto, denegamos expedir el auto solicitado. Veamos.

-I-

La controversia que tenemos ante nuestra consideración se remonta al 31 de enero de 2019, cuando Lime Properties presentó Demanda en contra del Consejo de Titulares del Condominio Ashford Valencia (Consejo), Juan Castillo Pavía y Lydia Esther Delgado Ruiz, CRM Relation Management, Inc. (CRM), y Cooperativa de Seguros Múltiples (Cooperativa), por unas alegadas filtraciones de agua ocurridas en el apartamento número 102 en el Condominio Ashford Valencia, propiedad de la parte demandante Lime Properties. Según se alegó en la Demanda, las filtraciones provienen de una fuga de agua ocurrida en el apartamento que queda en la parte superior al del 102, es decir, el apartamento 202. En la demanda también se alegó que dichas filtraciones han provocado daños a la propiedad de la parte recurrida.

El 4 de septiembre de 2019, la parte recurrida presentó una Demanda Enmendada, en la cual incluyó a la parte peticionaria como codemandado, por haber expedido unas pólizas de seguros con los números 16001780002649 y 1600188002450 a favor del Consejo. Véase párrafo Núm. 7 de la Demanda Enmendada.[1] El 19 de noviembre de 2019, la parte peticionaria presentó Moción Solicitando Desestimación por Falta de Póliza de Seguros, debido a que, según su contención, para el 12 de mayo de 2016 (fecha en la que comenzaron los alegados daños) MAPFRE no tenía una póliza de seguros expedida a favor de Consejo. Por lo tanto, argumentó que no tenía responsabilidad alguna frente a la parte recurrida.[2] Oportunamente, Lime Properties presentó su correspondiente oposición a la Moción Solicitando Desestimación. En la misma,

---

[1] Apéndice 2 del Peticionario, págs. 5-8.
[2] Apéndice 3 del Peticionario, págs. 9-19.

planteó que debido a que las filtraciones de agua se consideraban un daño continuo, estas alcanzaban y activaban los periodos de las pólizas expedidas por MAPFRE.

El 31 de enero de 2020, el TPI notificó una Resolución en donde declaró no ha lugar la solicitud de desestimación y dispuso que, a pesar de que MAPFRE no tenía una póliza de seguros expedida para la fecha de los hechos descritos en la Demanda Enmendada, el mecanismo de desestimación no era el adecuado debido a que, si desestimaba, daba por cierto la alegación de daños continuos.[3] A raíz de esto, la parte peticionaria contestó la demanda el 11 de febrero de 2020, y en esta negó las alegaciones expuestas en su contra.[4]

La parte recurrida presentó una Segunda Demanda Enmendada, a los fines de incluir como codemandados a las sucesiones de los causantes Juan Castillo Pavía y Lydia Esther Delgado Ruiz, quienes eran los dueños del apartamento 202 para la fecha de los alegados hechos. La parte peticionaria presentó su Contestación a la Segunda Demanda Enmendada, el 10 de noviembre de 2021. Como parte del descubrimiento de prueba llevado a cabo en el caso, se tomó deposición a los representantes del Consejo, así como también a CRM, quien era la compañía administradora del Condominio Ashford Valencia para el momento de los alegados hechos. De dichas deposiciones surgió que el Consejo tenía conocimiento de las filtraciones de agua que estaban ocurriendo desde los comienzos del año 2016.[5] Para esta fecha, la parte peticionaria no había expedido póliza alguna a favor del Consejo. Según surge de una de las deposiciones, esto fue confirmado por la persona que administraba el Condominio para ese

---

[3] Apéndice 5 del Peticionario, pág. 30.
[4] Apéndice 6 del Peticionario, págs. 31-35.
[5] Apéndice 11 del peticionario pág. 221.

momento, la Sra. Maureen Carrero Vidal. En específico, esta declaró que personalmente le informó a la Junta del Consejo la ocurrencia de estas filtraciones.[6] Luego de culminado el descubrimiento de prueba, el 9 de diciembre de 2022, la parte peticionaria presentó una Moción de Sentencia Sumaria Parcial, donde solicitó al TPI dictar sentencia sumaria a su favor toda vez que las filtraciones de agua alegadas en la Demanda Enmendada comenzaron en el 2016, previo a la expedición de las pólizas suscritas por MAPFRE. Al ser esto conocido por el Consejo, la parte peticionaria alegó que esto provocó que las pólizas expedidas para los periodos 2017 a 2018 y 2018 a 2019, no se activaran. Basado en ello, solicitó la desestimación de la acción incoada en su contra.[7]

El 19 de diciembre de 2022, la parte recurrida presentó una Moción de Sentencia Sumaria Parcial, donde solicitó que el TPI dictara sentencia sumaria su favor, aduciendo una serie hechos materiales que no estaban en controversia. Entre estos, que para el 2 de marzo de 2017 estaba ocurriendo un evento de filtración de agua y que el mismo había sido notificado.[8] Ese mismo día, el codemandado CRM también presentó una Moción Solicitando Sentencia Sumaria Parcial. El 31 de diciembre de 2022, el Consejo presentó una Moción en Oposición a Sentencia Sumaria Parcial y Moción de Sentencia Sumaria, siendo esta la única parte que presentó oposición a la solicitud de la peticionaria. En síntesis, el Consejo argumentó que existía controversia sobre su conocimiento en cuanto a las filtraciones de agua para el 2016 y que, a su vez, procedía que el TPI ordenara a MAPFRE a proveerle defensa y cubierta a su favor.

---

[6] Id.
[7] Apéndice 10 del Peticionario, págs. 49-67
[8] Apéndice 11 del Peticionario, págs. 68-674.

El 16 de enero de 2023, la parte peticionaria presentó su Réplica a Oposición de Sentencia Sumaria Parcial y Oposición a Moción de Sentencia Sumaria del Consejo, donde expresó que procedía declarar no ha lugar la oposición y solicitud de sentencia sumaria del Consejo toda vez que no controvirtió ningún hecho material presentado, incumpliendo con la Regla 36.3 de Procedimiento Civil. La parte peticionaria añadió que procedía la desestimación de la reclamación incoada en su contra, pues no existía póliza expedida por esta para la fecha en que comenzaron las alegadas filtraciones.

El 1 de agosto de 2023, el TPI notificó una Sentencia Parcial donde resolvió todas las mociones dispositivas presentadas, incluyendo la solicitud de los peticionarios, la cual declaró no ha lugar. Razonó que debido a que la filtración de agua iniciada en el 2016 fue reparada para el 9 de agosto de 2016 por el entonces ocupante del apartamento 202, no procedía resolver sumariamente si las pólizas expedidas por MAPFRE se activaron o no por la filtración ocurrida posterior a esa fecha. En esta sentencia parcial el TPI realizó las siguientes determinaciones de hechos:

HECHOS ESTIPULADOS

1. Lime [Properties] es una compañía limitada foránea autorizada para hacer negocios en el Estado Libre Asociado de Puerto Rico.
2. El Condominio Ashford Valencia es un condominio residencial localizado en la Avenida Ashford del Municipio de San Juan.
3. La parte demandante es dueña del apartamento 102 del mencionado condominio.
4. Los titulares del apartamento 202 del Condominio Ashford Valencia a la fecha de los hechos descritos en la Segunda Demanda Enmendada eran el Sr. Juan Castillo Pavía y su esposa la Sra. Lydia Esther Delgado Ruiz, ambos fallecidos.
5. La parte demandada CRM Relation Management, Inc., es la entidad que a la fecha de los hechos descritos en la Segunda Demanda Enmendada era la encargada de administrar el Condominio Ashford Valencia.
6. El Reglamento del Condominio en su Art. IX, Sec. 1, establece:

    "In the event of a violation (other than nonpayment of an assessment) by an owner of the provisions of the

Horizontal Property Act and/or of the Master Deed and/or of these By-laws, as the same may be amended from time to time, the Association may notify the owner in writing of said default and if such violation shall continue for a period of thirty (30) days from the date of notice, the Association shall have the election to file:

(a) An action at law to recover damages on behalf of the Association and/or the remaining owners,

(e) An action to enforce performance on the part of the defaulting owner,

(f) An action for such relief, as may be necessary to repair the violation, including injunctive relief."

7. El 6 de abril de 2022, el perito de la parte demandante, el Ing. José A. Fernández, y los peritos de las codemandadas Consejo y CRM, DYREK Engineering Services, PSC, acudieron al edificio Ashford Valencia e inspeccionaron los apartamentos 102 y 202.

8. MAPFRE PRAICO Insurance Co., expidió a favor del Consejo de Titulares del Condominio Ashford Valencia las pólizas de seguros 1600178002649, con fecha de vigencia de 04/18/2017 a 04/18/2018, y 1600188002450, con fecha de vigencia de 04/18/2018 a 04/18/2019.

9. La Cooperativa de Seguros Múltiples expidió la póliza número CPP 000715533, con fecha de vencimiento 04/18/2016 a 04/18/2017 a nombre de Condominio Ashford Valencia.

10. Las pólizas se rigen por sus términos, límites, condiciones y exclusiones.

## DETERMINACIONES DE HECHOS

1. El 20 de febrero de 1987, el Notario Jacobo Ortiz Murias autorizó la Escritura Núm. 6 para establecer el régimen de propiedad horizontal en el Condominio Ashford Valencia.

2. CRM es una corporación que se dedica a la administración de condominios privados.

3. El dueño de CRM es Cirilo Rivera González (Rivera González).

4. Maureen Carrero Vidal (Carrero Vidal) es la agente administradora de CRM y trabaja todas las operaciones de los condominios a los que CRM brinda servicios.

5. Jesús Castro era supervisor de la ruta en CRM, pero cesó funciones el 1 de abril de 2023.

6. El trabajo de Jesús Castro era visitar los condominios de lunes a viernes para recoger pagos de cuotas de mantenimiento, entregar los cheques para las firmas, comprar materiales de limpieza, buscar cotizaciones, supervisar las áreas comunes de los condominios para asegurarse de que todo estaba funcionando bien.

7. Además, si algún titular enviaba alguna solicitud para que se atendiera un asunto, Jesús Castro era quien iba a investigar para definir los próximos pasos a seguir.

8. En 1997, CRM comenzó a administrar, mes a mes, el Condominio Ashford Valencia.

9. El 1 de junio de 2005, la Junta de Directores del Consejo de Titulares del Condominio Ashford Valencia suscribió un Contrato de servicios profesionales con CRM por un año para que esta última se encargara de la administración del Condominio Ashford Valencia. El acuerdo se renueva automáticamente.

10. Según se acordó en el Contrato de servicios profesionales, CRM debía:
    a. Verificar todo lo relacionado con el mantenimiento de las áreas comunes del Condominio Ashford Valencia;
    b. Orientar a la Junta de Directores para el mejor uso y conservación de las áreas comunes del Condominio Ashford Valencia;
    c. Mantener la custodia de las cuentas de banco de la Junta de Directores;
    d. Utilizar el procedimiento de cotizaciones para reparaciones de servicios de mantenimiento;
    e. Recibir los pagos de las cuotas de mantenimientos de los condóminos;
    f. Preparar estados mensuales de ingresos y gastos mensuales;
    g. Preparar un presupuesto anual de operaciones;
    h. Supervisar los contratos de mantenimiento y reparación de los elementos comunes;
    i. Hacer cumplir con las disposiciones de la Ley de Condominios y del Reglamento del Condominio Ashford Valencia;
    j. Entre otras.

11. El Contrato de servicios profesionales, dispone, además, que CRM "será responsable única y exclusivamente por todo aquello a lo que se obliga en este contrato, y no responderá bajo ninguna circunstancia a nadie, ya sea una persona natural y/o jurídica por nada que no esté aquí expresado."

12. Según Carrero Vidal, algunas de las responsabilidades de CRM con el Condominio Ashford Valencia son:
    a. Cobro de cuotas de mantenimiento;
    b. Preparar cheques de los servicios del condominio y enviarlos a la Junta para la firma;
    c. Buscar cotizaciones para reparaciones o alguna obra o mejora del condominio;
    d. Atender la parte operacional del condominio;
    e. Evaluar propuestas;
    f. Hacer convocatorias de asambleas;
    g. Canalizar las deficiencias que reportan los titulares.

13. CRM participa de las asambleas del Condominio Ashford Valencia y toma notas, lleva la asistencia y se asegura de quiénes pueden votar y quienes no.

14. CRM se comunica con la Junta de Directores del Consejo de Titulares a través de correo electrónico, mediante notificaciones que se colocan por debajo de las puertas o a la dirección registrada que el titular provee.

15. Actualmente, el contacto de la Junta de Directores del Consejo de Titulares es el presidente, Ramón Alberto Pérez Troche (Pérez Troche). Para el 2016, era Aníbal Amador.

16. Pérez Troche es el presidente de la Junta de Directores del Consejo de Titulares desde, aproximadamente, el 2021.

17. Pérez Troche indicó que, cuando tiene dudas sobre el Reglamento del Condominio Ashford Valencia o de la Ley de Condominios, se comunica con Carrero Vidal, de CRM.

18. Mensualmente, CRM sostiene reuniones con el presidente de la Junta de Directores del Consejo de Titulares.

19. Cuando CRM recibe una queja de algún titular sobre otro, el asunto se refiere a la Junta de Directores del Consejo de Titulares para que tenga conocimiento y al titular sobre el cual se dio la queja.

20. Si la Junta de Directores del Consejo de Titulares lo autoriza, CRM le da seguimiento al titular que está violando el reglamento.

21. Cuando CRM recibe una queja de un titular de que hay filtraciones de otro apartamento, se comunica, por teléfono, correo electrónico o carta, con el titular del apartamento que está causando la filtración para que contrate un plomero que pueda identificar el problema.

22. Si la filtración está causando daño a un área comunal, CRM se lo notifica también a la Junta de Directores del Consejo de Titulares para que les autorice a contratar un plomero.

23. Cuando la filtración no afecta un área común, CRM le notifica a la Junta de Directores del Consejo de Titulares para que tengan conocimiento.

24. Si los titulares involucrados en la situación no vuelven a contactar a CRM, este no interviene ni da seguimiento.

25. Según Pérez Troche, cuando la Junta de Directores del Consejo de Titulares recibe una queja de un titular sobre algún asunto del condominio, se canaliza a través de Carrero Vidal, de CRM.

26. Según Pérez Troche, cuando la queja es de un titular sobre otro, la Junta de Directores del Consejo de Titulares trata de que se resuelva el problema entre ellos.

27. Según Pérez Troche, el procedimiento que sigue la Junta de Directores del Consejo de Titulares al recibir una queja de filtración de un apartamento a otro es comunicárselo a Carrero Vidal, de CRM, para que ella envíe un plomero.

28. El 27 de mayo de 2014, la Notaria Myrna Torres Santiago autorizó la Escritura Núm. 66 sobre la compraventa del Apartamento 102 en el Condominio Ashford Valencia a Lime Properties.

29. En 2016, Carrero Vidal recibió una notificación por correo electrónico del titular del apartamento 102 del Condominio Ashford Valencia en la cual se indicaba que tenían un problema de filtración que provenía del apartamento 202.

30. Cuando CRM recibió, a través de Carrero Vidal, la notificación de que había unas filtraciones del apartamento 202 del Condominio Ashford Valencia que estaban afectando al apartamento 102, se comunicó por teléfono con Héctor Díaz Castillo (Díaz Castillo), nieto de los titulares del apartamento 202, por ser el ocupante en ese momento.

31. CRM le informó a Díaz Castillo sobre las filtraciones y le proveyó la información del titular del apartamento 102 para que se comunicara.

32. Además, CRM, a través de Carrero Vidal, le notificó sobre la situación a la Junta de Directores del Consejo de Titulares.

33. Carrero Vidal se comunicó con Díaz Castillo en dos ocasiones, siendo la última el 8 de marzo de 2019.

34. Según Pérez Troche, la Junta de Directores del Consejo de Titulares nunca realizó una reparación de las filtraciones del apartamento 202 del Condominio Ashford Valencia.

35. Gretchen García Santiago (García Santiago) es la presidenta de Real Estate Opportunities Puerto Rico Corp. (Real Estate Opportunities).

36. García Santiago posee una licencia de bienes raíces del Departamento del Estado.

37. García Santiago ofrece servicios como agente de bienes raíces para Lime Properties

38. Las tareas de García Santiago para Lime Properties incluyen: mercadeo y venta de propiedades, inspecciones de los bienes inmuebles y análisis del valor de estos.

39. García Santiago comenzó a trabajar con el apartamento 102 del Condominio Ashford Valencia a principios del 2016.

40. García Santiago, de Real Estate Oportunities, indicó que la Asociación de Residentes del Condominio Ashford Valencia tenía conocimiento de la situación de filtración aproximadamente desde principios o mediados de 2016.

41. A mediados de 2016, la Asociación de Residentes del Condominio Ashford Valencia realizó varias visitas al apartamento 102 para observar la situación del filtrado.

42. García Santiago, de Real Estate Oportunities, preparó una carta, con fecha de 12 de julio de 2016, en la que acreditó que este último y un plomero que este contrató, visitaron el apartamento 102 del Condominio Ashford Valencia y el estacionamiento correspondiente al Penthouse de María de Lourdes Ortiz, para evaluar la situación de filtración de agua.

43. Para el 2017, Professional Plumbing había preparado tres estimados para  sobre la situación de la filtración del apartamento 102. Los estimados se produjeron a raíz de una situación de filtración entre el apartamento 102 y el almacén que queda debajo. El informe lo preparó el plomero Carlos Laureano. Los estimados fueron facilitados a Real Estate Oportunities, a través de Jean Carlos Martínez. Estos, a su vez, le facilitaron los estimados a Lime Properties.

44. Desde principios de 2019, nadie reside en el apartamento 202 del Condominio Ashford Valencia.

45. El 8 de marzo de 2019, Díaz Castillo le envió un correo electrónico a Carrero Vidal en el que indicó lo siguiente:
   a. Que la reclamación de las filtraciones se hizo en el 2016;
   b. Que la reparación inicial se hizo en el 2016 y se terminó el 9 de agosto de 2016;

c. Que Lime Properties se encargaría de unas cosas que quedaron pendientes que cotizó el plomero Carlos Laureano.

46. El 9 de septiembre de 2019, Mapfre emitió un pago de $606,089.28 a la Asociación de Condómines del Condominio Ashford Valencia como pago de la reclamación por daños ocasionados a la propiedad por el paso del huracán María a la póliza número 1600178002649.

47. Desde el 28 de mayo de 2020, el apartamento 202 del Condominio Ashford Valencia no tiene servicio de agua potable, debido a que se le cortó, según le notificó Pérez Troche, presidente de la Junta de Directores, al Ledo. Marcos Pérez Cruz.

48. El 10 de junio de 2022, FERPO Consulting, PSC (FERPO) preparó, para la representación legal de Lime Properties, un reporte sobre los daños que se observaron en el apartamento del Condominio Ashford Valencia en la visita del 6 de abril de 2022.

49. En su reporte, FERPO indicó que, un plomero que contrató realizó unas pruebas de filtraciones desde los baños del apartamento 202 del Condominio Ashford Valencia, para constatar si había alguna filtración.

50. Para llevar a cabo la prueba de filtración en el baño número 1, el plomero contratado por FERPO utilizó un tinte rojo. Básicamente, para hacer esta prueba, vertió el tinte rojo en el desagüe y en el borde de la bañera del baño del apartamento 202 del Condominio Ashford Valencia, y se pudo observar como el tinte se filtró hacia el techo del apartamento 102.

51. Similarmente, para la prueba en el baño número 2, el plomero contratado por FERPO utilizó tinte azul. En esta ocasión, vertió el tinte azul en el desagüe y en el borde de la bañera del baño del apartamento 202 del Condominio Ashford Valencia, y se pudo observar como el tinte se filtró hacia el techo del apartamento 102 y las paredes.

52. Luego de que se hicieran las pruebas, FERPO concluyó que existen filtraciones del apartamento 202 del Condominio Ashford Valencia hacia el apartamento 102, lo que ha ocasionado daños en los baños. Particularmente, sostuvo que se ha ocasionado daño a los techos de gypsum board, a la loza del piso, a los accesorios de baño, la puerta, receptáculos y lámparas.

53. Además, FERPO entiende que, cuando se haga la demolición correspondiente, se podría encontrar moho, lo cual aumentaría los daños.

54. De otra parte, FERPO observó que una pequeña pluma del apartamento 202 estaba goteando y causó que se inundara la cocina del apartamento 102.

55. FERPO estimó que los materiales para reparar los daños del apartamento 102 del Condominio Ashford Valencia costarán $48,545.34, más $15,000.00 por los posibles daños ocasionados por el moho.

56. El 7 de julio de 2022, DYREK Engineering Services, PSC (DYREK) preparó, para Seguros Múltiples, un reporte sobre los daños que se observaron en el apartamento del Condominio Ashford Valencia en la visita del 6 de abril de 2022.

57. DYREK indicó que inspeccionó los apartamentos 102 y 202 del Condominio Ashford Valencia y que, para poder hacer pruebas de filtraciones, se abrieron las llaves de paso de ambos apartamentos.

58. DYREK afirmó que se llevaron a cabo unas pruebas de filtraciones con tintes, y que se confirmó que el agua de los baños del apartamento 202 llegó al apartamento 102 a través de los paneles, el techo y las tuberías de las bañeras.

59. En su reporte, DYREK recomendó, entre otras cosas, (1) que se verifiquen el resto de los apartamentos que están encima del apartamento 202 para constatar si existen otras filtraciones, (2) que se verifique el drenaje del techo del Condominio Ashford Valencia para identificar posibles filtraciones de esa área, (3) que los drenajes del techo del Condominio Ashford Valencia se mantengan destapados y limpios como parte del mantenimiento regular.

60. DYREK estimó que los daños del apartmento 102 del Condominio Ashford Valencia, ocasionados por las filtraciones provenientes del apartment 202, ascienden a $45,798.00.

61. Desde el 30 de septiembre de 2022, CRM no ostenta la administración del Condominio Ashford Valencia.

62. El Art. III, Sec. 1 del Reglamento del Condominio Ashford Valencia establece que:

> The owners of units shall constitute the Association of Owners, called "the Association" hereinafter, which will have the responsibility of managing the Condominium, preparing and annual budget for the expenses of the same and collecting the monthly quotas or charges payable by each owner. The Association shall have the right to appoint ad administrator to lend the administration of the Condominium and to fix the compensation therefor. [...]

63. El Art. IV, Sec. 1 del Reglamento del Condominio Ashford Valencia dispone que: "The affairs of the Association shall be governed by a Board of Directors, called the "Board" hereinafter, composed of three (3) who shall be owners in good standing of units in the Condominium."

64. El Art. IV, Sec. 2 del Reglamento del Condominio Ashford Valencia establece que: "The Board shall have such Powers and duties as be necessary for the administration of the affairs of the Association and shall have authority to take action not served otherwise by law and/or by these By-Laws to the Owners."

65. El Art. IV, Sec. 3 del Reglamento del Condominio Ashford Valencia dispone que:

> In addition to the duties imposed by these By-Laws and/or resolution of the Association, the Board shall have the following:
> (a) Maintain, repair and supervise the Condominium
> (b) Collect the monthly assessments from the Owners

(c) Hire and fire the personnel necessary for the operation and maintenance of the Condominium and ix the salaries therefor.

66. Art. IV, Sec. 4 del Reglamento del Condominio Ashford Valencia establece que: "The Board shall be authorized to hire the services of an Administrator for the Association and fix the compensation therefor and determine the duties thereof, including, but without limitation thereto, the duties established by the preceding Section 3."

67. El Art. Vill del Reglamento del Condominio Ashford Valencia dispone, en lo pertinente, que:

The Owners shall:

(b) Carry on with due diligence the necessary maintenance and repair work in his unit.

(d) Repair and maintain the installation, pipes and conduits in his unit for water, electricity, sewer, telephone and sanitary facilities, as well as doors, windows, lamps and any other equipment or artefacts belonging to his unit.

(g) Permit entry to the Administrator or person authorized by the Board or by the Association. In case of an emergency arising in or threatening his unit or the Condominium, whether or not the owner is present.

(h) Permit the entry of other Owners, or representatives thereot, when necessary, to make repairs, installations or alteration and when such entry is requested in advance and made at a time convenient to the owner. In case of emergency, the right of entry shall be unqualified and immediate.[9]

El dicha Sentencia Parcial, el TPI encontró los siguientes hechos controvertidos:

**En primer lugar, de los hechos surge con claridad que la filtración se reparó en agosto de 2016, por lo que este tribunal desconoce si, al momento de contratar las pólizas, se le había notificado nuevamente a la Junta de Directores del Consejo de Titulares que las filtraciones persistían. Así, no se ha demostrado con certeza si las pólizas se podrían activar o no por los daños continuados que se alegaron en la demanda. De otra parte, es importante destacar que en el expediente no constan las pólizas que MAPFRE expidió. Esto es importante para poder determinar si los daños que se alegaron están incluidos en la cubierta. Por todo lo anterior, se determina que, en este momento, el tribunal no está en posición de determinar si MAPFRE responde o no.** (Énfasis nuestro).

**Cabe mencionar que este tribunal tampoco está en posición de determinar si MAPFRE tiene la responsabilidad de representar en este pleito al Consejo de Titulares.** (Énfasis nuestro).

**De lo que consta en el expediente surge que la Junta de Directores tenía conocimiento de las filtraciones y que, por gestiones de CRM, como administradora, se hicieron unas reparaciones el mismo año que se notificó el problema. Lo que**

---

[9] Apéndice 20 del Peticionario, págs. 1188-1198.

**no está completamente claro es lo que ocurrió luego de esas reparaciones iniciales.** (Énfasis nuestro).

El 10 de agosto de 2023, la parte la recurrida presentó una Tercera Demanda Enmendada con el fin de añadir nuevos codemandados a su reclamación. El 15 de agosto de 2023, la parte peticionaria presentó una Moción de Reconsideración y Solicitud de Determinación Adicional. En esta moción, también se le solicitó al TPI reconsiderar su determinación de no considerar su solicitud de sentencia. La parte peticionaria señaló que existía conocimiento previo de estas filtraciones por parte del Consejo en un periodo donde MAPFRE no había expedido póliza alguna. Además, argumentó que a pesar de que la filtración original se corrigió el 9 de agosto de 2016 y el 18 de abril de 2017 fue que entraron en vigor las pólizas de MAPFRE, ya para el 2 de marzo de 2017 había un evento de filtración ocurriendo en el apartamento. Razón por lo que, insistió que procedía desestimar la causa de acción contra MAPFRE.[10]

El 11 de septiembre de 2023, el TPI, motu proprio, emitió una Orden concediéndoles a las partes un término de 5 días para presentar su posición sobre la solicitud de reconsideración y de determinaciones adicionales de MAPFRE. El 19 de septiembre de 2023, la parte recurrida presentó Moción en torno a la "Oposición a Moción de Reconsideración y Solicitud de Determinación Adicional". Allí, aclaró que las alegaciones del Consejo habían sido controvertidas, debido a que se demostró que para el 2016 el Consejo y CRM sabían sobre las filtraciones provenientes del apartamento 202 al 102.[11] Ese mismo día, el TPI dictó una Resolución donde declaró "No Ha Lugar" la Moción de Reconsideración y Solicitud de Determinación Adicional de la

---

[10] Apéndice 22 del Peticionario, págs. 1,222-1,233.
[11] Apéndice 25 del Peticionario, págs. 1,241-1,243.

peticionaria.[12] Inconforme con dicha determinación, la parte peticionaria acude ante nos formulando los siguientes señalamientos de error:

> **Primer Error**: Erró el TPI al no realizar la determinación de hecho adicional, a pesar de tener la prueba para ello, la cual demuestra inequívocamente que para el 2 de marzo de 2017 las filtraciones de agua estaban ocurriendo y estas eran de conocimiento del Consejo.

> **Segundo Error**: Erró el TPI al declarar "No Ha Lugar" la Moción de Sentencia Sumaria Parcial, a pesar de que no existe controversia de hechos sobre el conocimiento previo del Consejo sobre las filtraciones de agua, y que dicho conocimiento provocó que las pólizas de seguro expedidas por MAPFRE no se activaran.

-II-

-A-

Distinto al recurso de apelación, el *certiorari* es un recurso extraordinario cuya característica se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos. *McNeil Healthcare v. Mun. Las Piedras I*, 206 DPR 391 (2021); 800 *Ponce de León v. AIG*, 205 DPR 163 (2020); *IG Builders et al. v. BBVAPR*, 185 DPR 307 (2012). Este Tribunal tiene la obligación de ejercer prudentemente su juicio al intervenir con el discernimiento del TPI. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83 (2008). En los procesos civiles, la expedición de un auto de *certiorari* se encuentra delimitada a las instancias y excepciones contenidas en la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1. *McNeil Healthcare v. Mun. Las Piedras I, supra*; *Scotiabank v. ZAF Corp et al.*, 202 DPR 478 (2019). La Regla 52.1 de Procedimiento Civil también dispone que sólo se expedirá un recurso de *certiorari* cuando "se recurra de una resolución u orden bajo remedios provisionales regulados por la Regla 56, de la Regla 57, (mecanismo de *injunction*) o de la denegatoria de una moción de carácter dispositivo." *800 Ponce de León v. AIJ, supra.*

---

[12] Apéndice 26 del Peticionario, pág. 1,244.

Por su parte, la Regla 40 del Reglamento de este Tribunal establece los criterios que debemos considerar al momento de ejercer nuestra facultad discrecional:

A.     Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

B.     Si la situación de hechos planteada es la más indicada para el análisis del problema.

C.     Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D.     Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E.     Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F.     Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G.     Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, R. 40.

-B-

La sentencia sumaria es un mecanismo procesal que provee nuestro ordenamiento jurídico para propiciar la solución justa, rápida y económica de controversias en las cuales resulta innecesario celebrar un juicio plenario. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414 (2013); *Const. José Carro v. Mun. Dorado*, 186 DPR 113 (2012); *Mejías et al. V. Carrasquillo et al.*, 185 DPR 288 (2012).

La función principal de la sentencia sumaria es que, en litigios de naturaleza civil, una parte pueda mostrar previo al juicio que, tras las partes contar con la evidencia que ha sido debidamente descubierta, no existe una controversia material de hecho que deba ser dirimida en un juicio plenario y que, por tanto, el tribunal está en posición de aquilatar esa evidencia para disponer del caso ante sí. *Rodríguez Méndez, et als v. Laser Eye*, 195 DPR 769 (2016); *Lugo*

*Montalvo v. Sol Meliá Vacation*, 194 DPR 209 (2015); *Const. José Carro v. Mun. Dorado, supra*, pág. 128.

El mecanismo de la sentencia sumaria está regido por la Regla 36 de Procedimiento Civil. R.P. CIV. 36, 32 LPRA Ap. V (2010). Esta Regla dispone que la solicitud de sentencia sumaria puede ser presentada por cualquiera de las partes que solicite un remedio por medio de una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. En estos casos, procederá dictarse sentencia sumaria si de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada que se presente, si alguna, se logra demostrar que no hay controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de Derecho, procede hacerlo. Regla 36.3 (e) de Procedimiento Civil, *supra; SLG Zapata-Rivera v. J.F. Montalvo, supra*.

La sentencia sumaria procede únicamente en aquellos casos en los que no existen controversias reales y sustanciales en cuanto los hechos materiales, por lo que lo único que queda, por parte del poder judicial, es aplicar el Derecho. *Oriental Bank & Trust v. Perapi S.E.,* 192 DPR 7 (2014); *SLG Zapata-Rivera v. J.F. Montalvo, supra*; *Nieves Díaz v. González Massas*, 178 DPR 820 (2010). Un hecho material es aquel que puede afectar el resultado de la reclamación al amparo del Derecho sustantivo aplicable. *Ramos Pérez v. Univisión*, 178 DPR 200 (2010); *Abrams Rivera v. ELA*, 178 DPR 914 (2010). La calidad del "hecho material" debe ser suficiente como para que sea necesario que un juez o jueza la dirima a través de un juicio plenario. *Ramos Pérez v. Univisión, supra*. Es decir, luego de aquilatar prueba testifical y de dirimir cuestiones de credibilidad.

Se ha establecido el formato y la manera específica de demostrar la inexistencia de controversia de hechos y la

correspondiente manera de derrotar la propuesta de que no existe controversia de hechos. Regla 36.3 (a) (1)-(4) de Procedimiento Civil, *supra*; *SLG Zapata-Rivera v. J. F. Montalvo, supra*, pág. 432; Regla 36.3 (b) (2), *supra*; *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714 (1986).

-C-

Cuando la moción de sentencia sumaria está sustentada con declaraciones juradas o con otra prueba, la parte que se opone no puede descansar en meras alegaciones y afirmaciones. Por el contrario, debe someter evidencia sustancial de los hechos materiales que están en disputa y demostrar que tiene prueba para sustanciar sus alegaciones. *Ramos Pérez v. Univisión, supra.* De no oponerse, correrá el riesgo de que la solicitud de sentencia sumaria sea acogida por el tribunal y se resuelva en su contra. *Ramos Pérez v. Univisión, supra*; *Luan Invest. Corp. v. Rexach Const. Co.*, 152 DPR 652 (2000). Toda duda sobre la existencia de una controversia de hechos bona fide debe ser resuelta contra la parte que solicita la sentencia sumaria. *SLG Zapata-Rivera v. J.F. Montalvo, supra*; *Córdova Dexter v. Sucesión Ferraiuoli*, 182 DPR 541 (2011). Por lo tanto, al determinar si existen controversias de hechos que impiden dictar sentencia sumaria, el juzgador debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la Moción en Oposición, así como los que obren en el expediente. Dicho examen debe ser guiado por el principio de liberalidad a favor de la parte que se opone a que se dicte sentencia sumaria. *Rosado Reyes v. Global Health Group, LLC*, 205 DPR 796, 809 (2020); *Ramos Pérez v. Univisión, supra.* De existir dudas sobre la existencia de una controversia de hechos, estas deben resolverse en contra del promovente ya que este mecanismo procesal no permite que el tribunal dirima cuestiones de credibilidad. Íd.; *Mgmt. Adm. Servs. Corp. v. ELA,* 152 DPR 599, 610 (2000); *Cuadrado Lugo*

*v. Santiago Rodríguez,* 126 DPR 272 (1990); *Corp. Presiding Bishop v. Purcell, supra,* pág. 720.

En *Meléndez González et al. v. M. Cuebas, supra,* nuestro Tribunal Supremo estableció el estándar específico que debe utilizar este Foro Apelativo Intermedio al momento de revisar denegatorias o concesiones de mociones de sentencia sumaria. En primer lugar, este Tribunal de Apelaciones se encuentra en la misma posición del TPI al momento de revisar solicitudes de sentencia sumaria. Por lo tanto, estamos regidos por la Regla 36 de Procedimiento Civil, *supra,* y nos aplican los mismos criterios que la jurisprudencia y la Regla 36, *supra,* le exigen al foro primario. En segundo lugar, por estar este foro apelativo en la misma posición que el primario, estamos en la obligación de revisar que tanto la moción de sentencia sumaria como su oposición, en caso de presentarse, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* según fueron pautados en *SLG Zapata-Rivera v. JF Montalvo, supra.* En tercer lugar, cuando consideremos la revisión de una Sentencia dictada por la vía sumaria, este tribunal tiene que examinar si en realidad existen hechos materiales en controversia.

De haberlos, estamos obligados a cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra,* por lo que tenemos la ineludible obligación de exponer concretamente los hechos materiales que encontramos están en controversia y, de haberlos, cuáles resultan ser incontrovertidos. Esta determinación procede ser hecha en la Sentencia que disponga del caso. También estamos facultados para hacer referencia al listado enumerado de hechos incontrovertidos que determinó el TPI. Finalmente, de encontrar este Tribunal de Apelaciones que los hechos materiales realmente resultan ser incontrovertidos, procede entonces revisar de *novo* si el TPI aplicó correctamente el Derecho.

-D-

Nuestro Tribunal Supremo, reiteradamente ha destacado que, en nuestro ordenamiento jurídico, el negocio de seguros está revestido de un alto interés público debido a su importancia, complejidad y efecto en la economía y la sociedad, razón por la cual ha sido ampliamente reglamentado por el Estado. *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48 (2011); *Jiménez López et al. v. SIMED*, 180 DPR 1 (2010); S.*L.G. Francis-Acevedo v. SIMED*, 176 DPR 372 (2009).

El contrato de seguro juega un papel económico crucial tanto a nivel individual como en el ámbito comercial, ya que le permite, tanto a las personas, como a los negocios, proteger sus recursos al transferir el impacto monetario de ciertos riesgos a cambio del pago de una prima. *L. Benítez de Lugo y Reymundo, El Riesto Jurídico, Madrid, Imp. Viuda Galo Sáez,* 17 (1961).

La póliza configura el documento escrito donde se plasman los términos que rigen el contrato de seguro. Éste se ha descrito como aquel pacto que suscriben las partes a través del cual "el asegurador, se compromete, a cambio del pago de una prima, a indemnizar a un tercero, por lo general al asegurado o un reclamante, por una pérdida contingente al ocurrir un evento futuro incierto previsto". *R. Cruz, Derecho de Seguros, 1ª ed., San Juan, Pubs. JTS, 1999, pág. 387.* Similar a todo contrato, sus términos constituyen la ley entre las partes. Véase S.*L.G. Ortiz-Alvarado v. Great American, supra.*

El Código de Seguros pauta la norma que ha de regir en el descargo de nuestra función interpretativa de las cláusulas contenidas en una póliza de seguro. A esos efectos, dicho cuerpo normativo dispone en su artículo 11.250 que "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y

según se hayan ampliado, extendido, o modificado". Ley 77 de 19 de junio de 1957, según enmendada 26 LPRA sec. 101 et seq. Capítulo 1. *Véase, además, Jiménez López et al. v. SIMED,* supra; *Echandi Otero v. Stewart Title,* 174 DPR 355 (2008); *Monteagudo Pérez v. E.L.A.,* 172 DPR 12 (2007).

Por tanto, los principios generales de hermenéutica atinentes a los contratos, según se explican en los Artículos 1233 a 1241 de nuestro vigente Código Civil se utilizarán únicamente de manera supletoria. CÓD. CIV. PR arts. 1233-1241, 31 LPRA § 5141 (2020 & Supl. 2023). *Jiménez López et al. v. SIMED, supra; Echandi Otero v. Stewart Title, supra; Molina v. Plaza Acuática,* 166 DPR 260 (2005). En aquellos casos en que surjan dudas en torno a la interpretación de los términos de una póliza, éstas deben resolverse de manera que se cumpla con el designio intrínseco de la misma, es decir, proveer protección al asegurado. *S.L.G. Francis-Acevedo v. SIMED, supra; Quiñones López v. Manzano Pozas,* 141 DPR 139 (1996).

Cónsono con lo anterior y similar al proceso de interpretación de las leyes, se examinarán las palabras contenidas en la póliza "en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces". CÓD. CIV. PR art. 1247, 31 LPRA § 5141 (2020 & Supl. 2023). *S.L.G. Ortiz-Alvarado v. Great American, supra; Jiménez López et al. v. SIMED, supra.* Como regla general, las disposiciones de un contrato de seguro deben de ser interpretadas liberalmente a favor del asegurado por constituir éste un contrato de adhesión. *S.L.G. Ortiz-Alvarado v. Great American, supra.*

No obstante, este principio de hermenéutica no tendrá aplicación cuando las cláusulas en cuestión resulten claras y libres de ambigüedad. En tales casos, se hará valer la clara voluntad de las partes y el asegurado vendrá obligado por los términos allí manifestados. *S.L.G. Ortiz-Alvarado v. Great American, supra;*

*Jiménez López et al. v. SIMED, supra; S.L.G. Francis-Acevedo v. SIMED, supra.* Los términos de un contrato se reputan claros "cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". *S.L.G. Francis-Acevedo v. SIMED, supra,* en la pág. 387.

De otra parte, cabe notar que las cláusulas de exclusión, que operan para limitar la cubierta provista por la aseguradora y, de este modo, no responder por determinados eventos, riesgos o peligros, son generalmente desfavorecidas. Así pues, éstas serán interpretadas restrictivamente en contra del asegurador para, de este modo, cumplir con el propósito intrínseco de la póliza, es decir, dar mayor protección al asegurado. No obstante, si las cláusulas de exclusión son claras y aplican a determinada situación, la aseguradora no será responsabilizada por aquellos riesgos expresamente excluidos. *Jiménez López et al. v. SIMED, supra; Echandi Otero v. Stewart Title, supra; Molina v. Plaza Acuática, supra. Véase también, Maderas Tratadas, Inc., v. Sun Alliance, CBI Securities,* 185 DPR 880 (2012).

-E-

Nuestro Tribunal Supremo ha reconocido y distinguido diferentes tipos de daños. Entre ellos se encuentran los daños continuos o continuados y los daños sucesivos. El Tribunal Supremo define los daños continuos como aquellos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca por ser previsible el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto

compuesto por elementos de daño actual y por tanto cierto". *Rivera Ruiz, et al. v. Mun. de Ponce,* 196 DPR 410, 417-418 (2016). Estos tipos de daños se distinguen por ser daños derivados de acto ilícito como unidad y no como una pluralidad de daños particulares.

Sobre los daños sucesivos, nuestro Tribunal Supremo sostuvo que estos constituyen una secuencia de daños individuales y concretos que se producen en intervalos finitos de tiempo. *Cacho González et al. v. Santarrosa et al.,* 203 DPR 215, 222-223 (2019). Cada lesión a causa de un acto u omisión culposa o negligente produce un daño distinto, que a su vez genera una causa de acción independiente. *Id.* Se tratan pues de daños ciertos que se van repitiendo, sin que necesariamente sean idénticos, y que no son previsibles o susceptibles de ser descubiertos empleando diligencia razonable. *Id.* Aunque tradicionalmente se han referido a las doctrinas bajo estudio como daños continuos o daños sucesivos, lo que en realidad es continuo o sucesivo en estos escenarios es el acto u omisión que produce el daño y no, necesariamente, la lesión sufrida. *Id.*

Los daños continuados tienen tres rasgos distintivos: (1) nace de uno o varios actos culposos o negligentes imputables al mismo actor; (2) los daños ocasionados se manifiestan ininterrumpidamente, y (3) esos daños, en conjunto, conforman un proceso perjudicial progresivo de carácter unitario. *Velázquez Ortiz v. Mun. Humacao, supra,* en las págs. 665-666.

-III-

En el caso ante nuestra consideración, el TPI tomó en consideración el hecho de que las pólizas expedidas por la parte peticionaria entraron en vigor luego de ocurrido el primer evento de filtraciones de agua en el edificio 202 del Condominio Ashford Valencia. Sin embargo, correctamente se negó a desestimar la demanda presentada en contra de la parte aquí peticionaria.

Ciertamente, el contrato de seguro suscrito entre la parte peticionaria y el Consejo establecía que la póliza cubriría eventos prospectivos. Sin embargo, es necesario que se ventile en juicio ordinario toda la evidencia que pueda demostrar o descartar que en efecto el daño provocado por las filtraciones de agua se trata de un daño continuado provocado por un mismo evento o si, por el contrario, se trata de un hecho independiente y posterior. Si de la prueba que se ventile en juicio, el TPI considera que se trata de un daño continuado, entonces la parte peticionaria podrá replicar los argumentos que presentó en su Moción de Sentencia sumaria ante el TPI y en su petición de certiorari ante este Tribunal. Si el TPI concluye que se trata de un evento independiente, entonces será tarea del TPI analizar el alcance de la cubierta del contrato de seguro y resolver el asunto de responsabilidad de la parte peticionaria.

Luego de analizar el expediente cuidadosamente, hemos llegado a la misma conclusión a la que llegó el TPI. Es necesario que la parte peticionaria presente prueba ante el Tribunal que demuestre que previo a expedir la póliza, el evento de fuga de agua que provocó los alegados daños ya había comenzado. De otra parte, la parte recurrida debe demostrar que en efecto la primera fuga de agua fue totalmente reparada en aquella primera ocasión y que definitivamente el segundo incidente es completamente independiente, permitiendo así que la póliza expedida por la parte peticionaria se active. Para determinar si se trata de un daño continuo o sucesivo, es necesario que el TPI considere otra prueba.

Debemos señalar también, que, según la Sentencia Parcial dictada por el foro primario, éste no tuvo ante su consideración las pólizas que se expidieron por la parte peticionaria. Sin embargo, la parte peticionaria incluyó como parte de sus anejos las pólizas en controversia. Ello, en contravención de la norma básica del derecho procesal apelativo de que, de ordinario, las partes que acuden a este

foro no pueden ni litigar asuntos ni presentar evidencia que no fueron traídas a la atención del foro primario. En este sentido, estamos impedidos de considerar prueba que no fue presentada ante el TPI.

Considerados los criterios establecidos en la Regla 40 de nuestro Reglamento, *supra*, concluimos que no está presente circunstancia alguna que amerite nuestra intervención, en esta etapa de los procedimientos, con la discreción ejercida por el TPI. Coincidimos con el TPI, en su conclusión de que no era posible desestimar la Demanda Enmendada en contra de la parte peticionaria por la vía sumaria. No erró el TPI al no realizar la determinación de hecho adicional solicitada por la parte peticionaria, y al declarar No Ha Lugar la Moción de Sentencia Sumaria Parcial.

-IV-

Por los anteriores fundamentos, denegamos expedir el auto de *certiorari* presentado por la parte peticionaria.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones